ESTATE OF JAMES E. CRAFT, THOMAS J. CRAFT, EXECUTOR, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 778–74.    Filed May 24, 1977.

*Robert O. Rogers,* for the petitioner.
*William H. Newton III,* for the respondent.

FORRESTER, *Judge:* Respondent has determined a deficiency in estate tax of $237,383.78. Concessions having been made, the issues remaining for our decision are as follows:

(1) Whether certain property, which was transferred in trust by decedent during his lifetime, is includable in his gross estate under sections 2036[1] and 2038; and

(2) Whether petitioner is entitled to a deduction under section 2053 for executor's commissions in the amount of $63,722.66, or whether such deduction should be limited to $5,000.

## FINDINGS OF FACT

James E. Craft (Craft or decedent) died testate on November 17, 1969. At the time of his death, Craft was a resident of Palm Beach, Fla. The executor of his estate, Thomas J. Craft (Thomas), resided in Florida at the time the petition herein was filed. Petitioner's Federal estate tax return (Form 706) was filed on February 19, 1971, with the District Director in Jacksonville, Fla.

Decedent was married to Helen Craft (Helen) on November 11, 1938. He had two children, Paul and James, by a prior marriage, and he and Helen had four children by their own marriage. Two of these four children, Jerry and Thomas, had been born at the time the indenture of trust (to be discussed *infra*) was executed, and the other two, Jack and John, were born subsequent to such execution.

On December 31, 1945, decedent, together with Helen and his two sons by the prior marriage, transferred certain property in trust. The indenture of trust, established under the laws of West Virginia, provided, in pertinent part, as follows:

THIS INDENTURE OF TRUST, made this 1st day of November 1944,[2] by and between J. E. Craft, Helen T. Craft, his wife, PAUL E. CRAFT and JAMES W. CRAFT, parties of the first part, hereinafter sometimes referred to as Grantors, and J. E. CRAFT, TRUSTEE, party of the second part, hereinafter sometimes referred to as the Trustee;

### WITNESSETH:

That in consideration of the trust hereinafter set forth as well as the sum of One Dollar ($1.00) to each of the Grantors paid in cash, the receipt of which is hereby acknowledged, the Grantors have respectively given and

---

[1] Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954.

[2] For reasons unrelated to the issues raised herein, the property was not actually transferred until Dec. 1 and Dec. 30 of 1945.

granted and by these presents do assign, set over, grant, convey and deliver unto the Trustee for the uses and purposes hereinafter set forth all of the following property, to-wit:

FIRST: The said J. E. Craft and Helen T. Craft, his wife, do grant and convey unto J. E. Craft, Trustee, for the uses and purposes herein provided all of the following parcels of real estate:

* * *

SECOND: The said Helen T. Craft, for the consideration aforesaid as well as in consideration of the distributive share of the trust herein provided for her, the same being recognized and acknowledged as of value fully equivalent to the value of the shares by this paragraph transferred, does hereby sell, assign, set over, transfer and deliver unto the said Trustee for the uses and purposes herein provided, Two Hundred Twenty (220) shares of the capital stock of Consolidated Bus Lines, Inc., certificate therefor duly endorsed for transfer being delivered herewith;

THIRD: The said Paul E. Craft, for the consideration aforesaid as well as in consideration of the distributive share of the trust herein provided for him, the same being recognized and acknowledged as of value fully equivalent to the value of the shares by this paragraph transferred, does hereby sell, assign, set over, transfer and deliver unto the said Trustee for the uses and purposes herein provided, Two Hundred Fifty (250) shares of the capital stock of Consolidated Bus Lines, Inc., certificates for which duly endorsed for transfer are delivered herewith.

FOURTH: The said James W. Craft, for the consideration aforesaid as well as in consideration of the distributive share of the trust herein provided for him, the same being recognized and acknowledged as of value fully equivalent to the value of the shares by this paragraph transferred, does hereby sell, assign, set over, transfer and deliver unto the said Trustee for the uses and purposes herein provided, Two Hundred Fifty (250) shares of the capital stock of Consolidated Bus Lines, Inc., certificates for which duly endorsed for transfer are delivered herewith;

To HAVE AND To HOLD the aforesaid property and securities together with all rights and appurtenances thereunto belonging or in any wise appertaining, as well as its income and increment, unto the said Trustee, his successors and assigns, for the uses and purposes herein provided. The Grantors reserve the right to enlarge the corpus of this trust by granting, conveying, assigning, transferring and delivering to the Trustee hereafter other property for inclusion therein, and the right to add new and other beneficiaries of this trust, except that in no circumstances shall the said J. E. Craft be or become a beneficiary hereof, and to change the distributive shares or beneficial interests in said trust from those herein provided, except that no share of a Grantor herein shall be diminished without his or her consent; and the Grantors expressly confer upon the Trustee authority to accept such additional property as well as any other property which may come to or be received by the Trustee for inclusion herein from other persons or sources, and authority to include and incorporate the same into the corpus of the trust hereby created.

* * *

7. The Trustee shall periodically at convenient intervals throughout her life pay over to the said Helen T. Craft one-fourth of all the net income from the said trust, and if circumstances should arise making it in the discretion of the Trustee advisable and helpful so to do, the Trustee shall have authority to pay over to or for the benefit of the said Helen T. Craft any part of the principal of said trust up to a one-fourth part thereof, but after any invasion of the corpus of the trust for such purpose the portion of the net income distributed to the said Helen T. Craft thereafter shall be proportionately decreased. * * *

8. The Trustee shall hold one-fourth of the said trust and income arising therefrom for the use and benefit of the said Paul E. Craft and shall periodically at convenient intervals pay over to or for the benefit of the said Paul E. Craft such part of the net income from said trust up to one-fourth thereof as in the judgment of the Trustee shall be advantageous and for the best interest of the said Paul E. Craft, but the amount of income distributed to or for the benefit of the said Paul E. Craft shall not in any year be less than one-half of all that portion of the net income from said trust which is available for the said Paul E. Craft hereunder. * * *

9. The Trustee shall hold one-fourth of the said trust and income arising therefrom for the use and benefit of the said James W. Craft and shall periodically at convenient intervals pay over to or for the benefit of the said James W. Craft such part of the net income from said trust up to one-fourth thereof as in the judgment of the Trustee shall be advantageous and for the best interest of the said James W. Craft, but the amount of income distributed to or for the benefit of the said James W. Craft shall not in any year be less than one-half of all that portion of the net income from said trust which is available hereunder for the said James W. Craft. * * *

This trust instrument also made provision for the two children, Jerry and Tom, born to decedent and Helen at the time of execution, as well as all afterborn children, as follows:

10. The Trustee shall hold one-fourth of the said trust estate and the income arising therefrom for the use and benefit equally of Jerry Craft, Tom Craft and any other child or children of the said J. E. Craft and Helen T. Craft, and their issue per stirpes, the survivors or survivor of them, their, his or her heirs and distributees, as follows: the aforesaid one-fourth portion of said trust estate shall be divided into two equal parts, and if and whenever there should be born hereafter to the said J. E. Craft and Helen T. Craft another or other child or children, then redivided into as many equal parts as there are children of the said J. E. Craft and Helen T. Craft; * * *

11. Subject only to the provisions of paragraph 10 hereof, the Trustee shall hold one-eighth of the said trust and the income arising therefrom for the use and benefit of the said Jerry Craft and shall accumulate, reinvest and hold for the benefit of the said Jerry Craft until he attains the age of twenty-one years, all of the income arising from said portion of said trust, plus its accretions and accumulations, but with discretionary authority in the Trustee to expend any part of such income for such things and at such

times as in his judgment may promote the best interest of said beneficiary except that no part of the said income shall at any time during the infancy of the said Jerry Craft and during the lifetime of his father, J. E. Craft, be expended for the maintenance or support of the said infant or to provide anything for which his father might be legally liable; * * * * * *

12. Subject only to the provisions of paragraph 10 hereof, the Trustee shall hold one-eighth of the said trust and the income arising therefrom for the use and benefit of the said Tom Craft and shall accumulate, reinvest and hold for the benefit of the said Tom Craft until he attains the age of twenty-one years, all of the income arising from said portion of said trust, plus its accretions and accumulations, but with discretionary authority in the Trustee to expend any part of such income for such things and at such times as in his judgment may promote the best interest of said beneficiary except that no part of the said income shall at any time during the infancy of the said Tom Craft and during the lifetime of his father, J. E. Craft, be expended for the maintenance or support of the said infant or to provide anything for which his father might be legally liable; * * *

The indenture of trust further provided:

18. Upon the resignation, death or inability of the said Trustee or any successor Trustee to continue serving as Trustee hereunder, there shall be substituted in his place and stead, with all the powers, discretion, authority, duties and responsibility herein provided for the Trustee, such person, natural or corporate, or persons as the said J. E. Craft, or in the event of his death or failure to act, as the said Helen T. Craft may by writing duly subscribed and acknowledged designate and appoint, and if neither the said J. E. Craft nor Helen T. Craft should so designate and appoint a successor Trustee, then such successor shall be appointed by order of the Circuit Court of Mercer County, West Virginia, in a proper proceeding had for that purpose.

The drafting and preparation of this indenture of trust extended over a 3-year period and was largely the work of George Richardson (Richardson), an attorney, and C. E. Elberson (Elberson), an accountant. Both Richardson and Elberson had represented decedent in other matters, and decedent felt both individuals to be quite competent in their respective fields.

On January 2, 1945, decedent resigned his position as trustee and appointed Richardson in his place. On March 2, 1955, Richardson resigned and decedent appointed as trustee the First National Bank of Bluefield, located in Bluefield, W. Va.

Pursuant to an agreement with the trustee, both Helen and Paul withdrew their respective one-fourth shares of the trust

prior to decedent's death. James died in 1953 and his one-fourth share was set aside in a separate account for his children. Jerry and Tom likewise removed their respective one-sixteenth portions of the trust prior to the date of decedent's death. Thus, on November 17, 1969, the date of decedent's death, the only remaining trust assets consisted of two one-sixteenth portions held for the two children of decedent and Helen, Jack and John, who were born after the execution of the trust instrument. The parties have agreed that such remaining assets had a value of $182,541.39 on November 17, 1970, the alternate valuation date.

In his will, decedent appointed his son Thomas as executor and specifically provided that, as executor, Thomas should receive a fee of $5,000. Thomas accepted the position of executor in accordance with the terms and conditions specified in the will.

Prior to his death, decedent told Thomas that he desired the First National Bank of Bluefield (hereinafter the bank) to perform the bulk of the administrative probate work of his estate and that Thomas' functions as executor would be mostly ministerial. After decedent's death, Thomas consulted with a Florida attorney who advised him that, under Florida law, the bank could not administer the estate. Accordingly, when the bank's representatives requested that Thomas turn over the estate's assets to them, he refused to do so and assumed the full responsibilities and duties of the executor himself.

On April 8, 1970, Thomas executed a renunciation of the executor's fees provided for under the will. For reasons unknown to Thomas, this document was never filed with the appropriate Probate Court. On May 17, 1971, Thomas executed another renunciation of the executor's fees provided for in the will, and such document was filed with the Probate Court on May 23, 1971.

On September 9, 1973, Thomas executed Form 4421 (Declaration—Executor's Commissions and Attorney's Fees) in which he stated as follows:

I * * * Thomas J. Craft, * * * declare under penalties of perjury that my * * * total commissions of $5,000.00 to administer this estate * * * have been agreed upon and have been or will be paid as follows:

| Name and address of payee | Social Security number of payee | Total amount paid or to be paid | Date paid or to be paid |
|---|---|---|---|
| Thomas J. Craft | 267–68–7546 | | on or before Jan. 1, 1974 |

Over an approximate 6-year period following his father's death, Thomas spent almost 8,000 hours working on estate-related matters. In late 1975, he petitioned the appropriate Probate Court in Palm Beach County, Fla., for allowance of executor's fees in excess of the $5,000 provided for in decedent's will. On February 20, 1976, that court entered the following order in response to his petition:

ADJUDGED that Thomas J. Craft as Executor under the Will of JAMES E. CRAFT, Deceased, is authorized and directed to withdraw from First National Bank in Palm Beach, depository for the estate, commissions in the amount of $63,722.66 and costs for indirect expenses in the amount of $995.42 to be paid to Thomas J. Craft, individually, in full payment for his ordinary services rendered to this estate as the executor.

As of the date of the trial of this case, no executor's fees in excess of $5,000 had in fact been paid to Thomas.

Petitioner has conceded that fees incurred by the bank are deductible only in the amount of $605 as determined by respondent's statutory notice and that the custodial account is includable in the gross estate to the extent of $38,886.77. At trial, the parties also read into the record the following stipulation:

There will be allowed as a deduction attorney's fees and reasonable costs incurred in respect to this appeal and the probate and other proceedings connected therewith.

The parties likewise have agreed that, on November 17, 1970, the alternate valuation date, the fair market value of 625 shares of Holiday Inn, Inc., common stock was $871.48 rather than $625 as reported on the estate tax return.

OPINION

### Issue 1. Whether the Value of the Trust's Assets Are Includable in Decedent's Gross Estate

The parties have agreed that on November 17, 1970, the alternate valuation date, the value of the property transferred in trust by decedent was $182,541.39. Respondent offers two separate arguments for support of his position that such amount should be included in decedent's gross estate. His first

argument is that inclusion is required under sections 2036 and 2038 because of the powers decedent retained as grantor to add new beneficiaries to the trust and to change the beneficial interests. Respondent's alternative contention is that, given the powers vested in the trustee to determine the distribution and accumulation of the trust's income and principal, decedent's retained power to appoint a successor trustee, including himself, likewise renders the assets taxable to his estate under both of the aforementioned sections. We concur with and hold for respondent based on his first argument for inclusion and, therefore, see no need to reach the merits of his alternative contention.

Respondent's first argument is grounded on the following powers retained by decedent under the trust instrument:

The Grantors reserve the right to enlarge the corpus of this trust by granting, conveying, assigning, transferring and delivering to the Trustee hereafter other property for inclusion therein, *and the right to add new and other beneficiaries of this trust,* except that in no circumstances shall the said J. E. Craft be or become a beneficiary hereof, *and to change the distributive shares or beneficial interests in said trust from those herein provided,* except that no share of a Grantor herein shall be diminished without his or her consent * * * [Emphasis supplied.]

Respondent contends that, by the clear and unambiguous terms of this language, decedent, as one of the grantors, reserved the power to add new beneficiaries and to change their respective beneficial interests. Accordingly, respondent's position is that the value of the trust's assets should be included in decedent's estate under both sections 2036(a)(2)[3] and 2038(a)(1).[4]

---

[3] SEC. 2036. TRANSFERS WITH RETAINED LIFE ESTATE.

(a) GENERAL RULE.—The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death—

* * *

(2) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom.

[4] SEC. 2038. REVOCABLE TRANSFERS.

(a) IN GENERAL.—The value of the gross estate shall include the value of all property—

(1) TRANSFERS AFTER JUNE 22, 1936.—To the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, where the enjoyment thereof was subject at the date of his death to any

If respondent's construction of the trust instrument is correct, there is clear authority to support his position that the amount involved is includable in decedent's estate under both of the above sections. *Lober v. United States,* 346 U.S. 335 (1953); *Round v. Commissioner,* 332 F.2d 590 (1st Cir. 1964); *Guggenheim v. Helvering,* 117 F.2d 469 (2d Cir. 1941). Petitioner does not dispute the legal authority for respondent's position but rather urges that, notwithstanding the above-quoted language, a proper construction of the trust instrument would result in decedent's having retained no powers on the date of his death either to add new beneficiaries or to change their distributive shares.

Following the habendum clause in the trust instrument in which the grantors reserve the powers at issue, paragraphs 1 through 19 grant various powers to the trustee and impose certain restrictions on the conduct of his activities. Paragraph 10 provides that the trustee shall hold one-fourth of the trust estate equally for the benefit of Jerry and Tom Craft—the two children of the marriage of decedent and Helen who were alive at the time the instrument was executed. That same paragraph further provides that the one-fourth portion shall be divided into two one-eighth portions for the benefit of Jerry and Tom, but that if there are any afterborn children of their marriage, such portion shall be redivided equally among all children of their marriage. Paragraphs 11 and 12 specifically direct the trustee with regard to administering the respective one-eighth portions allocated to Jerry and Tom.

Petitioner's proposed construction of the trust is based upon the initial limitation contained in the beginning of both paragraphs 11 and 12, viz, "subject only to the provisions of paragraph 10 hereof." It is petitioner's contention that, because paragraphs 11 and 12 are subject *only* to the provisions of paragraph 10 (concerning afterborn children), such language is in direct conflict with the powers reserved to the grantors to add new beneficiaries and to change their respective interests since such reserved powers would consti-

---

change through the exercise of a power (in whatever capacity exercisable) by the decedent alone or by the decedent in conjunction with any other person (without regard to when or from what source the decedent acquired such power), to alter, amend, revoke, or terminate, or where any such power is relinquished in contemplation of decedent's death.

tute additional limitations not contemplated by the "subject only" language. Thus, petitioner argues that we resolve this conflict either by interpreting the reserved grantor powers as applying only to the other three portions of the trust[5] or, alternatively, that we should look to all the circumstances surrounding the execution of the trust instrument in order to determine decedent's intentions. In response to this latter argument, respondent urges that the parol evidence rule should operate to exclude such an examination of decedent's subjective intent.

It seems an obvious axiom of trust law that the powers reserved by the grantor of the trust are separate and distinct from those conferred upon the trustee. See 1 Scott, Trusts 37 (3d ed. 1967); 2 Scott, Trusts 164 (3d ed. 1967); *Estate of Fruehauf v. Commissioner,* 50 T.C. 915, 923–924 (1968), and cases cited therein. In administering the trust assets in accordance with the terms of paragraphs 11 and 12, it is quite clear that the *trustee* was to follow the terms of paragraphs 11 and 12 *subject only* to the provisions of paragraph 10 (specifically, the duty to redivide the assets in the event of any afterborn children). We fail to understand, however, how this limitation on the trustee is at all in conflict with those separate and distinct powers that decedent reserved to himself as grantor. It seems quite logical to us that decedent may have wanted to reserve the right to add new beneficiaries to the trust, such as any children he and Helen might adopt at a later date or any children he might have by a subsequent marriage following Helen's death or their divorce. Further, he may also have recognized that in future years certain children might be more financially secure than others and that he might find it desirable to change their respective beneficial interests. At the same time, however, we think he would have wanted an independent trustee[6] to abide strictly by the

---

[5] The other parts of the trust were held for Helen, Paul, and James.

[6] Under the trust instrument as first executed decedent was appointed trustee. However, the fact that he held this position for only 3 days after all the property was finally transferred into trust before appointing Richardson as trustee indicates to us that decedent's intentions were that the trust be administered by an independent trustee rather than by himself. This conclusion is supported by a letter, introduced into evidence by petitioner, in which Richardson indicated to Elberson that in order to avoid decedent's being taxed on the trust's income, decedent might have to resign as trustee and appoint a successor.

original divisional requirements contained in the trust instrument until such a time that he, as grantor, felt the need to make a change. This is what he achieved by the execution of the trust instrument before us, and we see no reason to alter the clear and unambiguous terms of what seems to us to be a quite rational document.

We simply cannot accept petitioner's position that these disputed powers retained by decedent as grantor be construed as applying only to the other three portions of the trust. Such a provision would have been most easy to include in the instrument and, absent any such provision, we cannot impute such an intention to decedent.

Petitioner introduced documentary evidence and testimony at trial for the purpose of showing that neither decedent nor Richardson or Elberson (who were involved in the drafting of the trust instrument) intended that decedent retain the disputed powers. Respondent objected at trial to the admission of this evidence on the basis of the parol evidence rule and has renewed his objection on brief. At trial we reserved a ruling on this matter and, at this time, we hold that respondent's objection must be sustained.

The parol evidence rule is as easy to define as it is difficult in many cases to apply. Williston defines the rule as requiring—

in the absence of fraud, duress, mutual mistake, or something of the kind, the exclusion of extrinsic evidence, oral or written, where the parties have reduced their agreement to an integrated writing. * * * [4 Williston, Contracts, sec. 631, p. 949 (3d ed. 1961).]

Scott states the rule as follows:

Under the parol evidence rule, if the manifestation of intention of the settlor is integrated in a writing, that is, if a written instrument is adopted by him as the complete expression of his intention, extrinsic evidence, in the absence of fraud, duress, mistake or other ground for reformation or rescission, is not admissible to contradict or vary it. * * * [1 Scott, Trusts 301 (3d ed. 1967).]

In the past, this Court has followed two separate approaches in applying the parol evidence rule when one of the parties before us has attempted to rely on the rule in an effort to exclude extrinsic evidence offered by the other. We think the instant case affords us an opportunity to review our thinking

and to set forth a clearer statement of our position in this area.

In a great many cases before this Court, either petitioner or respondent has attempted to introduce extrinsic evidence relating to a disputed will, trust, or contract, and the other party has objected to the admissibility of such evidence based on the parol evidence rule. In a number of these cases, we have held that, because respondent was not a party to the instrument involved, neither he nor petitioner may successfully rely on the rule to exclude extrinsic evidence offered by the other. *Coven v. Commissioner*, 66 T.C. 295, 306 (1976); *Graphic Press, Inc. v. Commissioner*, 60 T.C. 674, 681 (1973), revd. on another issue 523 F.2d 585 (9th Cir. 1975); *Seay v. Commissioner*, 58 T.C. 32, 39 (1972); *Estate of O'Brien v. Commissioner*, 57 T.C. 27, 30–31 (1971); *Brown v. Commissioner*, 52 T.C. 50, 60 (1969); *Schmitz v. Commissioner*, 51 T.C. 306, 317 (1968), affd. sub nom. *Throndson v. Commissioner*, 457 F.2d 1022 (9th Cir. 1972); *Poole v. Commissioner*, 46 T.C. 392, 406 (1966); *Nichols v. Commissioner*, 43 T.C. 135, 145 (1964); *Lacy v. Commissioner*, 39 T.C. 1100, 1104 (1963), affd. 341 F.2d 54 (10th Cir. 1965); *Estate of Holtz v. Commissioner*, 38 T.C. 37, 41 (1962); *Harrison v. Commissioner*, 17 T.C. 1350, 1357 (1952); *Haverty Realty & Investment Co. v. Commissioner*, 3 T.C. 161, 167 (1944).

The practical effect of applying this "third-party to the instrument rule" is that, in virtually all cases, parol or extrinsic evidence offered by either party in connection with a written document will be admissible in cases before us because respondent is almost never a party to the document at issue. We have justified this rejection of the parol evidence rule on the theory that, in the taxation area, administrators and courts are concerned with substance not form and, therefore, formal written documents should not be rigidly binding on either the petitioner or respondent. *Estate of O'Brien v. Commissioner, supra; Brown v. Commissioner, supra; Harrison v. Commissioner, supra.*

We have found additional support for this position from the idea that, historically, the parol evidence rule was designed to protect the rights of one of the parties to the written instrument who is seeking to uphold the instrument and who may have detrimentally relied on its terms. We have noted

that, "this historic reason for the rule is never present in a contest between the taxing authority and one of the parties to the questioned agreement. The Commissioner will not have changed his position one iota in reliance on its terms." (*Schmitz v. Commissioner, supra* at 317. Fn. ref. omitted.)

However, there exists a separate and distinct line of cases decided by this Court involving the use of parol or extrinsic evidence in which we have not relied upon the above-described approach to the rule. In these cases, most of which involve the construction of the terms of a will or a trust, we have instead looked to and followed the applicable State law regarding the admissibility of extrinsic evidence. *Estate of Council v. Commissioner*, 65 T.C. 594, 607 (1975); *Estate of Cutter v. Commissioner*, 62 T.C. 351, 357 (1974); *Estate of Hill v. Commissioner*, 64 T.C. 867, 874 (1975), on appeal (5th Cir., June 3, 1976); *Estate of Cox v. Commissioner*, 59 T.C. 825, 829 (1973); *Dri-Power Distributors Association Trust v. Commissioner*, 54 T.C. 460, 477 (1970); *Estate of Opal v. Commissioner*, 54 T.C. 154, 160 (1970), affd. 450 F.2d 1085 (2d Cir. 1971); *Estate of Schwehm*, 17 T.C. 1435, 1441 (1952).

The result of this State law approach, as opposed to the "third-party to the instrument rule," is that in some cases the parol evidence rule has been successfully invoked by one of the parties before us to exclude extrinsic evidence offered by the other because we determined that a State court applying the State parol evidence rule would have done so. E.g., *Estate of Cutter v. Commissioner, supra; Estate of Opal v. Commissioner, supra.*

Inconsistent treatment in this area is by no means confined solely to this Court. One leading commentator states:

> The rule excluding extrinsic evidence which is sought to be introduced for the purpose of affecting a written instrument is applied only where the controversy is between the parties to the instrument or their privies. A stranger to the writing is not affected by the rule, the reason being that, since the stranger has had no part in making the writing, he should not be prejudiced by matters appearing therein and should not be precluded from showing the truth even though it tends to vary or contradict the terms of the instrument. * * * [Jones, Evidence, sec. 16.17, p. 117 (6th ed. 1972).]

Another authority, however, states with equal conviction that, "it is generally held that the parol evidence rule may be invoked by and against a person who is not a party to the

agreement." Calamari & Perillo, Contracts, sec. 45, p. 87 (1st ed. 1970).

Moreover, there are Circuit Court cases holding that the rule does not apply to controversies between the Commissioner and a party to the contract, e.g., *Stern v. Commissioner*, 137 F.2d 43, 46 (2d Cir. 1943); *Scofield v. Greer*, 185 F.2d 551, 552 (5th Cir. 1950); *Landa v. Commissioner*, 206 F.2d 431, 432 (D.C. Cir. 1953), and those holding that there are circumstances under which the Commissioner may successfully assert the rule, see *Commissioner v. Danielson*, 378 F.2d 771, 779 (3d Cir. 1967), and cases cited therein.

It is against this background that we must rule on whether the extrinsic evidence offered by petitioner in the instant case shall be considered in construing this instrument. In so doing, we are faced with two possible avenues of approach: (1) Overrule his objection and consider the offered evidence on the theory that respondent cannot rely on the parol evidence rule because he was not a party to the trust instrument; or (2) look to West Virginia law to determine whether extrinsic evidence of this nature would be admissible by a West Virginia court if that court were attempting to make the same determination as to the nature and extent of the disputed powers. We are of the opinion that, given the nature of the determination we must make in the instant case, the latter approach is the one we must follow.

In the instant case, we are confronted with the task of determining the nature and extent of the powers conferred on the grantor and the trustee under a West Virginia trust instrument. It is a well-settled legal principle that such an inquiry involves a determination of legal rights and interests under the applicable State law. *Helvering v. Stuart*, 317 U.S. 154 (1942); *Blair v. Commissioner*, 300 U.S. 5 (1937); *Robertson v. United States*, 310 F.2d 199 (5th Cir. 1962).

It is true that, in making this State law determination, we apply those rules of evidence applicable in trials without a jury in the United States District Court for the District of Columbia. Sec. 7453; Rule 143(a), Tax Court Rules of Practice and Procedure. However, it is well recognized that the so-called "parol evidence rule" is a misnomer and that the rule is one of substantive law and not one of evidence. 9 Wigmore,

Evidence, sec. 2400, p. 3 (3d ed. 1940); 3 Corbin, Contracts, sec. 573, p. 357 (1st ed. 1960); 4 Williston, *supra* at 955–956.

Therefore, we think it naturally follows, and we so hold, that in those instances where we are called upon to make a State law determination as to the existence and extent of legal rights and interests created by a written instrument, we must look to that State's parol evidence rule in deciding whether or not to exclude extrinsic evidence that bears on the disputed rights and interests under the instrument.

To hold otherwise could conceivably lead to an anomalous situation in which, because we had admitted and found convincing parol evidence that would have been excluded by a State court, we might determine and cause to be taxed certain interests and rights that a State court applying State law would find to be nonexistent. Such a result would do violence to that fundamental principle of tax law that State law creates legal rights and property interests while the Federal law determines what, and to what extent, interests or rights, so created, shall be taxed. *Morgan v. Commissioner*, 309 U.S. 78 (1940).

Our holding herein, however, should not be construed as a total rejection of the "third-party to the instrument rule" as applied in those numerous cases cited *supra*. The vast majority of such cases did not involve a determination of legal rights or property interests under State law but rather concerned the proper allocation (or character) of amounts paid under a contract. Otherwise stated, such cases were not concerned with ownership of the property interest but with the true reasons for and behind its receipt by the owner. E.g., *Graphic Press, Inc. v. Commissioner, supra; Seay v. Commissioner, supra; Schmitz v. Commissioner, supra; Nichols v. Commissioner, supra; Lacy v. Commissioner, supra.* In making that type of determination, we think our continued liberal admission of extrinsic evidence is required in order that we base our decisions on the substance of the documents before us rather than their form.

Also unaffected by our holding herein is the rule established by *Commissioner v. Lester*, 366 U.S. 299 (1961). In general, that case held that extrinsic evidence designed to alter the language of a divorce decree or separation agreement will not be considered in determining whether payments

made thereunder constitute alimony or child support where the character of such payments is specifically fixed by the decree or agreement. This rule is grounded on the precise requirements of section 71(b) and the specific language contained in that Federal statute. Thus, the application of the rule of the *Lester* case is confined solely to that narrow area of the tax law. See *Grummer v. Commissioner*, 46 T.C. 674, 678 et seq. (1966).

Petitioner in the instant case has offered extrinsic evidence in an attempt to prove that decedent did not intend to retain the power to add new beneficiaries to the trust or to change their beneficial interests. West Virginia courts have consistently held that intent must be judged exclusively from the words of such an instrument and that, where the writing is unambiguous, extrinsic evidence is not admissible to give language a different meaning or to vary or contradict the terms of the instrument. *Farmers & Merch. Bk. v. Farmers & Merch. Bk.*, 216 S.E.2d 769 (W. Va. 1975); *Weiss v. Soto*, 142 W. Va. 783, 98 S.E.2d 727 (1957).

As we have pointed out, *supra*, we find no contradictions or ambiguities in the trust instrument before us. Decedent quite clearly retained the power to add new beneficiaries and change their beneficial interests. We are convinced that a West Virginia court, faced with the task of determining the nature and extent of such powers, would not admit the evidence proffered by petitioner attempting to show a contrary intent and to contradict the clear terms of the trust instrument. Accordingly, in making our determination as to the nature and extent of these powers, we must likewise hold that such evidence is inadmissible.

### Issue 2. Deductibility of Executor's Fees

Under the terms of decedent's will, Thomas was to receive a fee of $5,000 for his services as executor. Before he died, decedent explained to Thomas that he wanted the bank to perform the bulk of the probate work and that Thomas' duties as executor would be primarily ministerial. After decedent's death, Thomas consulted with an attorney and was advised that under Florida law the bank could not administer the estate. Accordingly, Thomas performed most of the probate work himself and between November 1969 and late 1975, he

spent almost 8,000 hours working on matters related to the estate.

On April 8, 1970, Thomas, apparently recognizing that the administration of the estate would be a rather lengthy and time-consuming process, executed a renunciation of the fee provided for in the will. This document, however, was never filed with the Probate Court. Accordingly, he executed a second renunciation and filed this document with the court on May 23, 1971. On February 20, 1976, that court held that Thomas was entitled to fees in the amount of $63,722.66 in lieu of the $5,000 provided for in the will.

Respondent has determined that the allowable deduction under section 2053(a)(2)[7] should be limited to $5,000, while petitioner argues that a deduction for the full $63,722.66 should be allowed. On this issue, we agree with and hold for petitioner.

Respondent's position is that under the applicable Florida probate law, Thomas was barred from receiving a fee in excess of $5,000 and that respondent is not bound by any State decree at variance with State law. With this latter proposition we are in agreement. Sec. 20.2053–1(b)(2), Estate Tax Regs. Our disagreement with respondent lies in his interpretation of the applicable Florida probate law.

As in other States, Florida has a so-called "non-claim statute" that acts as a bar against the enforceability of otherwise valid claims against an estate if such claims are not filed within a certain prescribed time period. The Florida statute applicable to the year at issue is Florida Statutes Annotated section 733.16, which provides, in part, as follows:

733.16 Form and manner of presenting claims; limitation

(1) No claim or demand, whether due or not, direct or contingent, liquidated or unliquidated, or claim for personal property in the possession of the personal representative or for damages, including but not limited to

---

[7] SEC. 2053. EXPENSES, INDEBTEDNESS, AND TAXES.

(a) GENERAL RULE.—For purposes of the tax imposed by section 2001, the value of the taxable estate shall be determined by deducting from the value of the gross estate such amounts—

  * * *

(2) for administration expenses,

  * * *

as are allowable by the laws of the jurisdiction, whether within or without the United States, under which the estate is being administered.

actions founded upon fraud or other wrongful act or commission of the decedent, shall be valid or binding upon an estate, or upon the personal representative thereof, or upon any heir, legatee or devisee of the decedent unless the same shall be in writing and contain the place of residence and postoffice address of the claimant, and shall be sworn to by the claimant, his agent or attorney, and be filed in the office of the county judge granting letters. *Any such claim or demand not so filed within six months from the time of the first publication of the notice to creditors shall be void even though the personal representative has recognized such claim or demand by paying a portion thereof or interest thereon or otherwise;* \* \* \* [Emphasis supplied.]

Respondent argues that, because the letters testamentary were issued on December 17, 1969, and Thomas' renunciation of his $5,000 fee was not filed with the Probate Court until May 28, 1971, Thomas' claim is barred by reason of not having been filed within the prescribed 6-month period.[8]

Petitioner directs us to Florida Statutes Annotated section 734.01, dealing with compensation paid to personal representatives, which provides in pertinent part as follows:

734.01 Expenses and compensation
\* \* \*

(c) When provision is made by the will of the decedent for compensation to a personal representative, the compensation fixed by such will shall be in full satisfaction for his services in lieu of the compensation provided unless by an instrument filed with the county judge he renounces all claim to the compensation given by the will.

This statute does not specify a time period within which renunciation must take place in order to be effective. It is respondent's position that the 6-month period of section 733.16 must apply. We disagree.

The Supreme Court of Florida has not passed on this question and, therefore, our task is to apply what we find to be the State law after giving proper regard to the relevant rulings of the Florida lower courts. *Commissioner v. Estate of*

---

[8] Again, we think respondent has misconstrued the Florida law. The 6-month period within which claims must be filed begins with the date of the first publication of the notice to creditors. Fla. Stat. Ann. sec. 733.15 provides that the first notice shall be published *after* the taking out of letters testamentary. There is nothing in the record before us to indicate when that publication was first made and, thus, we are unable to determine the exact date that the 6-month time limitation began to run. In view of our holding that the 6-month limitation does not apply to Thomas' claim, any determination as to the date of first publication of the notice to creditors is superfluous.

*Bosch,* 387 U.S. 456 (1967). Our research has revealed no such relevant Florida lower court rulings nor were any cited to us by the parties herein.

In interpreting the Florida nonclaim statute, we think respondent has failed to make a necessary distinction between "claims or demands" against the estate and "expenses of administration." By the clear language of the statute, Florida Statutes Annotated section 733.16 applies only to "claims or demands," and we think that executor's fees are clearly "expenses of administration" to which the nonclaim statute should not apply.[9] We are unable to find any Florida cases on point, but the recognized rule in other jurisdictions is that a claim for administration expenses is not the type of "claim or demand" contemplated by the nonclaim statute. See *In Re Will of Skarda,* 88 N.M. 130, 537 P.2d 1392 (1975); *In Re Desisles' Estate,* 59 Ill. App. 2d 194, 208 N.E.2d 122 (1965); *Cox v. Amend,* 97 R.I. 382, 198 A.2d 48 (1964); *In Re Iverson's Appeal,* 249 Minn. 156, 81 N.W.2d 701 (1957); *McLeod v. Fielder,* 79 R.I. 321, 88 A.2d 329 (1952); *Plummer, County Treasurer v. Light,* 139 Wash. 670, 247 P. 1022 (1926); *In Re Lutz's Estate,* 175 Mo. App. 427, 162 S.W. 679 (1914).

Respondent expresses concern that if the 6-month time limit is not held to apply to the renunciation provision there would be no limit on the period within which an executor could file a renunciation. Again, we have been unable to find any Florida cases dealing with the proper time within which renunciation must occur. The clear weight of authority in other States, however, is that, where there is no time fixed by statute, the renunciation must take place within such time as the court deems "reasonable." See 19 A.L.R.3d 520, 551 (1968), and cases cited therein. Given the initial uncertainty as to who would perform the probate duties and the extended period of administration, we are unable to conclude that Thomas' renunciation was unreasonably late and we do not understand respondent to argue otherwise.

We frankly do not understand why Thomas, on September 23, 1973, executed Form 4421 declaring that his total

---

[9] We note that in setting forth the order in which the personal representative shall make payments, Fla. Stat. Ann. sec. 733.20 clearly distinguishes between "expenses of administration" and "claims against the estate."

commissions would be $5,000. We note that the form states that if the amount of the declared commissions is later changed the Internal Revenue Service must be notified. There is nothing in the record before us to indicate whether or not Thomas in fact made such notification. In any event, our decision with respect to the allowability of the deduction must rest on what we have found to be the applicable State law, and any misrepresentations Thomas may have made to respondent are outside the scope of our consideration.

*Decision will be entered under Rule 155.*

Reviewed by the Court.

SIMPSON, *J.*, concurring: I fully agree with the majority's conclusion that because of the legal issue presented in this case, we are required to interpret the decedent's will in the same manner as would a State court in West Virginia. However, I wish to emphasize that our holding today does not mean that parol evidence is always to be excluded in estate tax cases. The applicability of today's holding will depend upon the precise issue to be decided by us. For example, when we are faced with the question of whether a decedent retained for his life the "possession or enjoyment" of property within the meaning of section 2036(a)(1),[1] parol evidence will be admissible to demonstrate such "possession or enjoyment" even if the instrument, by which the decedent transferred the property, purported to deny him any rights or interest in the property, and even if the relevant State law would prevent the admission of such parol evidence. In such a case, the issue turns on the meaning of "possession or enjoyment"—Federal tax concepts which do not depend upon State law property rights or interests. See *Estate of McNichol v. Commissioner,*

---

[1] (a) GENERAL RULE.—The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death—

(1) the possession or enjoyment of, or the right to the income from, the property
* * *

265 F.2d 667, 670 (3d Cir. 1959), affg. 29 T.C. 1179 (1958), cert. denied 361 U.S. 829 (1959). Such concepts are concerned with actual possession or enjoyment, not with whether such interests are protected or enforceable under State law. See, e.g., *Guynn v. United States,* 437 F.2d 1148, 1150 (4th Cir. 1971); *Estate of McNichol v. Commissioner, supra* at 669; *Estate of Hendry v. Commissioner,* 62 T.C. 861, 871–872 (1974); *Estate of Kerdolff v. Commissioner,* 57 T.C. 643, 648 (1972); *Estate of Barlow v. Commissioner,* 55 T.C. 666, 670 (1971). Thus, whenever the legal issue presented in a case turns on a Federal tax standard, and does not turn on local law, we will continue to admit and examine all relevant evidence. There may also be other situations when we should look at all relevant evidence to carry out the purpose of a Federal tax provision, and so, the result reached in the majority's opinion should not be regarded as one of general applicability.

RAUM, J., agrees with this concurring opinion.