T.C. Memo. 1996-244


UNITED STATES TAX COURT


FOUNTAIN VALLEY TRANSIT MIX, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 2114-94.                          Filed May 28, 1996.


<u>Jerome Pastor</u> and <u>Neil Dilman</u>, for petitioner.

<u>Robert F. Conte</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

SCOTT, <u>Judge</u>:  Respondent determined a deficiency in petitioner's Federal income tax for its fiscal year ending June 30, 1990, in the amount of $100,784, and a penalty under section 6662(b)(2) in the amount of $24,667.  Some of the issues raised by the pleadings have been disposed of by agreement of the parties, leaving for decision:  (1) Whether petitioner is

entitled to a deduction as a trade or business expense of the cost of purchasing tires which it contends were for use on leased trucks; and (2) whether petitioner is liable for an accuracy-related penalty under section 6662[1] as determined by respondent.

FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioner, Fountain Valley Transit Mix, Inc., is a California corporation. At the time of the filing of the petition in this case, petitioner maintained its principal place of business in Fountain Valley, California. Petitioner filed its Federal income tax return for its fiscal year ending June 30, 1990, with the Internal Revenue Service Center in Fresno, California.

Petitioner was incorporated in June 1987 and operated a ready-mixed concrete business in southern California during its fiscal year ending June 30, 1990. Petitioner produced and delivered ready-mixed concrete to unrelated third-party contractors who had building projects in the southern California area.

During its fiscal year 1990, petitioner was owned half by Mr. Kurt Caillier (Kurt Caillier) and half by Kurt Caillier's brother, Mr. Randy Caillier (Randy Caillier). In 1990, Kurt

_____

[1] All section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

Caillier, Randy Caillier, their father Andre Caillier and Kurt Caillier's uncle Mr. Howard Le Mieux (the Caillier family), owned or controlled the following corporations: (1) A&A Ready-Mixed Concrete, Inc. (A&A); (2) L.A. Premix; (3) Royal Tire Co., Inc., doing business as Johnny Gillette Tire Co. (Gillette Tire); (4) R&K Trucking; (5) Cemak Trucking; (6) Downey Transit Mix; and (7) Mission Viejo Materials. During the years 1990 and 1991, the Cailliers owned at least seven companies which used trucks in the operations of their businesses.

In 1990, Kurt Caillier was the president of A&A. A&A used concrete trucks in the operation of its business. During petitioner's fiscal year 1990, A&A had larger gross sales than petitioner.

Kurt Caillier is the president and 50-percent owner of L.A. Premix, another ready-mixed concrete company which uses concrete trucks in the operation of its business. L.A. Premix was formed and began operations sometime in 1990.

In 1990, the Caillier family began purchasing concrete trucks for L.A. Premix. For a period prior to the full operation of L.A. Premix, petitioner leased some of the concrete trucks which the Caillier family had purchased for L.A. Premix.

In 1990, Kurt Caillier owned 50 percent of Cemak Trucking, Downey Transit Mix, and R&K Trucking. Each of these companies used trucks in the operation of its business.

During petitioner's fiscal year 1990, Gillette Tire was in the business of selling and recapping tires. For its fiscal year ending March 31, 1991, Gillette Tire filed a consolidated tax return with A&A. Gillette Tire derived a substantial portion of its income from the sale of truck tires and tire-related services to unrelated third parties.

In June 1987, petitioner signed a lease agreement with Nikki's Leasing Corp. (Nikki's) to lease ready-mixed concrete trucks (the Nikki lease). Kurt Caillier established Nikki's and other leasing companies in 1987 to lease trucks to the Caillier family's related companies. These companies were owned by children of Kurt and Randy Caillier but controlled by Kurt and Randy Caillier. During petitioner's fiscal year 1990, Kurt Caillier was the president of both petitioner and Nikki's.

During its fiscal year ending June 30, 1990, petitioner leased trucks from Nikki's pursuant to the Nikki lease. In 1990, petitioner had on lease from Nikki's 48 trucks. The number of trucks used by petitioner fluctuated from day to day. If petitioner needed additional trucks, it would use available trucks of related companies and sometimes would rent trucks from unrelated sources. In 1990, petitioner did not own any concrete trucks.

In 1990, Mr. Chris Pisano (Mr. Pisano) was petitioner's general manager. As general manager, Mr. Pisano ran the daily

operations of petitioner.  Mr. Pisano also ran the daily operations of L.A. Premix.

The Nikki lease required Nikki's, as lessor, to pay for the replacement of all tires on the trucks it leased to petitioner. The second clause of paragraph 5 of the Nikki lease (the tire replacement clause) stated as follows:

> Lessor will provide at its own cost and expense all necessary replacement tires and tubes.  Lessee agrees that Lessee's driver will substitute the spare tire when tire trouble occurs on said vehicle while in possession of Lessee's driver and that Lessee's drivers shall not operate said motor vehicle on a flat tire or tires, or any tire or tires which do not contain sufficient air pressure to prevent damage to the sidewalls thereof, other than from ordinary wear and tear.

The Nikki lease further stated that the lessor was to provide and pay for all mechanical repairs, maintenance, and parts and labor. Petitioner was to provide for lubrication and gasoline expenses as well as washing and cleaning the trucks.  Paragraph 13 of the lease stated:

> WAIVER.  The failure of either party hereto in any one or more instances to insist upon the performance of any of the terms, covenants or conditions of this lease, exercise any right or privilege in this agreement conferred or the waiver of any breach of any of the terms, covenants, or conditions of this agreement, shall not be construed as hereafter waiving any such terms, covenants, conditions, rights or privileges but the same shall continue and remain in full force and effect the same as if no such forbearance or waiver had occurred.

The lease agreement which was signed on behalf of Nikki's by Kurt Caillier and on behalf of petitioner by Chris Pisano was

shown to Internal Revenue Agent Paul Siebert (Agent Siebert) in 1992 during an audit of petitioner's tax liability for its fiscal year 1990 to substantiate the truck rental expense petitioner was claiming on its Federal income tax return for that fiscal year. When respondent's agent was given the Nikki lease, he was not informed it had been modified, and no addendum was attached to the Nikki lease. An addendum had not been entered into at that time.

The tire replacement clause in the Nikki lease was pointed out to Kurt Caillier by Agent Siebert during the audit of petitioner's tax liability for its fiscal year 1990. Thereafter, Kurt Caillier signed for both the lessee and lessor an addendum to the lease (the Nikki lease addendum) which stated as follows:

> Confirming the existing practice between companies:
> The Lessee shall be responsible for the replacement of all worn tires and return the vehicle to Lessor with the tire in good condition. Reasonable wear and tear excepted.

> The monthly rental shall take this into consideration.

April Leasing Corp. (April Leasing), Elissa Leasing Corp. (Elissa Leasing), Andrea Leasing Corp. (Andrea Leasing), and Stacey Leasing Corp. (Stacey Leasing) were also leasing companies which were controlled by Kurt Caillier and Randy Caillier. These companies were established in 1987 to lease concrete trucks to entities controlled by the Caillier family in the same way that Nikki's leased trucks to petitioner. The lease agreements

entered into between April Leasing, Elissa Leasing, Andrea Leasing, and Stacey Leasing, and other concrete companies controlled by the Caillier family, contained the same terms as the Nikki lease, placing the obligation of purchasing new tires on the lessor. After Agent Siebert pointed out the tire replacement clause in the Nikki lease to Kurt Caillier in 1992, Kurt Caillier signed on behalf of the lessor addenda to the Elissa Leasing, Andrea Leasing, and Stacey Leasing leases identical to the addendum to the Nikki lease. These addenda were then attached to the original leases. Kurt Caillier in 1992 signed on behalf of April Leasing an addendum to its lease with A&A identical to the Nikki lease addendum, and Andre Caillier signed this addendum on behalf of A&A. The addendum to the April Leasing lease, however, was dated December 31, 1987.

In April 1990, Gillette Tire had an opportunity to purchase a large number of tires at a discount. Mr. Ron Rose (Mr. Rose), who handled all the maintenance, and Mr. Cliff Bodie (Mr. Bodie), who handled all the tire maintenance for all the related companies named above, figured out how many tires in total should be purchased for use of all the related concrete companies during a 1-year period. Mr. Pisano determined the tires needed by petitioner's leased trucks for a year. The number of tires which Mr. Rose and Mr. Bodie determined would be needed by all the related concrete companies was based on the total yardage of concrete they estimated the companies would haul during the year

1990. Gross sales of a ready-mixed concrete operation during a year are directly related to the yards of concrete the company sells during that year. The number of tires used on the trucks operated by a ready-mixed concrete business is dependent on the distance the trucks are driven, which is related to the number of yards of concrete sold, since the range for hauling of concrete is limited by the time the concrete will remain useful after it is placed in the truck. Generally, petitioner would not deliver concrete to a location that was more than a 90-minute drive from petitioner's plant. Kurt Caillier approved the bulk purchase of tires.

On April 9, 1990, Gillette Tire submitted invoice No. 30088 to petitioner in the amount of $387,637.30 for 993 tires. According to a Gillette Tire billing statement dated June 1, 1990, petitioner paid $129,212.43 on May 18, 1990, approximately one-third of $387,637.30, to Gillette Tire. The billing statement indicates that the payment was in reference to invoice No. 30088. Petitioner's books and records indicate that this payment to Gillette Tire was made with petitioner's check No. 4318.

According to petitioner's books and records, another payment of $129,212.43 was made by petitioner with check No. 4369 on June 28, 1990, to Gillette Tire with respect to the April 9, 1990, invoice. On June 30, 1990, an intercompany account between

petitioner and Gillette Tire showed that petitioner owed an additional $261,392 to Gillette Tire.

A statement from Gillette Tire to petitioner dated June 1, 1990, shows a number of charges by Gillette Tire to petitioner from May 10 to June 10, 1990, and the following payments or credits to the account:

| 1055-A | R | 05/18/90 | 30088 | -129,212.43 |
| 1875-A | R | 05/24/90 | 28824,29234.223 | -4416.15 |
| [blank] | A | 05/30/90 | [blank] | -387,637.30 |

The repair expenses which were claimed on Nikki's Federal income tax returns for its fiscal years ending September 30, 1988, September 30, 1989, and September 30, 1990, were allocated to Nikki's returns by Mr. John Gaeta (Mr. Gaeta), A&A's vice president. Mr. Gaeta was also responsible for allocating other expenses such as repairs, fuel, and insurance among the related companies. The repair expenses were allocated to Nikki's returns pursuant to the terms of the Nikki lease. The repair expenses incurred by petitioner and the other related ready-mixed concrete companies were allocated to the leasing companies' returns, just as certain other expenses were allocated. For example, petitioner had its own fuel pumps, and trucks of related companies as well as petitioner's trucks used those pumps. Some of the expense of the fuel pumps was later allocated to the other related companies.

Petitioner's Federal income tax returns for its years ending June 30, 1988, 1989, and 1990 showed the following respective gross receipts and expenses:

| Year | Gross receipts | Fuel tax | Truck maintenance | Fuel |
|---|---|---|---|---|
| 1988 | $13,692,622 | $24,729 | $656,537 | $301,497 |
| 1989 | 17,168,758 | 47,401 | 770,155 | 466,045 |
| 1990 | 19,645,187 | 53,035 | 884,262 | 280,069 |

According to the information reported on petitioner's income tax returns for its fiscal years 1988, 1989, and 1990, petitioner's fuel taxes increased as its gross receipts increased. However, in 1990, petitioner's fuel expenses dropped significantly despite the increase in gross receipts and fuel taxes.

Kurt Caillier very briefly reviewed petitioner's Federal income tax return for its fiscal year ending June 30, 1990 (the return), before he signed it. Kurt Caillier signed the return, presuming it was correct. Kurt Caillier was aware that the tire expense at issue in this case was deducted on the return.

Nikki's Federal income tax returns for the fiscal years ending September 30, 1988, 1989, and 1990, showed the following respective gross rents and expenses:

| Year | Gross rents | Insurance | Truck maintenance | Licenses |
|---|---|---|---|---|
| 1988 | $722,938 | $84,745 | $236,589 | $26,474 |
| 1989 | 1,396,971 | 87,591 | 275,783 | 77,796 |
| 1990 | 1,303,300 | 73,264 | 232,639 | 109,177 |

According to the information reported on Nikki's returns, Nikki's gross rents and license fees doubled from 1988 to 1989. However, from 1988 to 1990, despite the increase in gross rents as compared to 1988, insurance expenses and truck maintenance expenses decreased.

For its fiscal years ending September 30, 1988, 1989, and 1990, Nikki's reported taxable income as follows:

| Fiscal year ended | Taxable income (loss) |
|---|---|
| Sept. 30, 1988 | ($31,543) |
| Sept. 30, 1989 | 93,786 |
| Sept. 30, 1990 | (30,896) |

A&A's gross sales for its fiscal year ending March 31, 1991, were $43,784,608.

For its fiscal year ending March 31, 1991, Gillette Tire reported net sales of $4,790,749.

During his audit of petitioner's tax liability, Agent Siebert reviewed every item in petitioner's truck maintenance account for the fiscal years ending June 30, 1990 and 1991. Among the items in the account claimed as truck maintenance expenses on petitioner's Federal income tax returns for its fiscal years ending June 30, 1990 and 1991, Agent Siebert found no invoice for the purchase of tires other than Gillette Tire's invoice No. 30088 for $387,637.30 dated April 9, 1990. During his examination, Agent Siebert was given no documentation relating to the actual delivery of the tires petitioner purchased

from Gillette Tire, nor to the installation of tires on petitioner's trucks.

Also, Agent Siebert, during his audit of petitioner's income tax liability, asked to see all of petitioner's documents relating to the rental of Nikki's concrete trucks, including documents which showed how the rental rate was set and how many trucks were being rented. Petitioner had very few records with reference to the rental of trucks and no records showing the number of trucks that were used by petitioner on a weekly, monthly, or yearly basis.

Respondent in her notice of deficiency determined that petitioner was not entitled to deduct $258,425 of its claimed deduction for truck maintenance expenses. This amount was the total amount of checks numbered 4318 and 4369 to Gillette Tire which petitioner claims were for tires purchased for its trucks.

OPINION

Section 162(a) generally allows a taxpayer a deduction for all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. These expenses must be directly connected with or pertaining to the taxpayer's trade or business. Sec. 1.162-1(a), Income Tax Regs.

As a general rule, where an expense is the obligation of another, a taxpayer cannot properly claim a deduction for the expense as an ordinary and necessary expense of his business. Deputy v. du Pont, 308 U.S. 488 (1940); Betson v. Commissioner,

802 F.2d 365, 368 (9th Cir. 1986), affg. on this issue T.C. Memo. 1984-264.

Respondent's position in this case is that under the lease between Nikki's and petitioner, the purchase of tires was an expense of Nikki's and, therefore, the tire purchase expense was properly deductible by Nikki's and not by petitioner.  In order to show that the lease was not an accurate statement of the agreement between the parties, petitioner introduced the testimony of Kurt Caillier, which respondent objects to under the parol evidence rule.  Under the terms of the lease, the obligation of paying for the tire expenses was Nikki's. Petitioner argues that Kurt Caillier's testimony should be admitted to prove that the terms of the lease were contrary to the intent of the parties.  Respondent contends that any parol evidence pertaining to the tire expense provision in the lease should be excluded.

As a preliminary matter, respondent contends that we should apply the "Danielson rule", Commissioner v. Danielson, 378 F.2d 771 (3d Cir. 1967), vacating 44 T.C. 549 (1965), to determine the rights of the parties in this case.[2]  This Court has consistently

---

[2]  In Commissioner v. Danielson, 378 F.2d 771, 775 (3d Cir. 1967), vacating 44 T.C. 549 (1965), the court stated:

a party can challenge the tax consequences of his agreement as construed by the Commissioner only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show

(continued...)

held that we do not follow the <u>Danielson</u> rule unless required to do so by <u>Golsen v. Commissioner</u>, 54 T.C. 742, 756-757 (1970), affd. 445 F.2d 985 (10th Cir. 1971), and has instead adopted a "strong proof rule". <u>Anderson v. Commissioner</u>, 92 T.C. 138, 171 (1989); <u>Elrod v. Commissioner</u>, 87 T.C. 1046, 1065-1066 (1986); <u>G.C. Servs. Corp. v. Commissioner</u>, 73 T.C. 406, 412 (1979). Since the Court of Appeals for the Ninth Circuit, the Circuit to which this case is appealable, has not explicitly adopted the <u>Danielson</u> rule, see <u>Schmitz v. Commissioner</u>, 51 T.C. 306, 315-316 (1968), affd. sub nom. <u>Throndson v. Commissioner</u>, 457 F.2d 1022, 1025 (9th Cir. 1972), we will apply the "strong proof rule" which we have adopted. Under this rule, parol evidence is admissible on the issue of whether a clear provision of an agreement was put in the agreement by mistake.

The parties point out that in <u>Estate of Craft v. Commissioner</u>, 68 T.C. 249, 263 (1977), affd. 608 F.2d 240 (5th Cir. 1979), we stated:

> where we are called upon to make a State law determination as to the existence and extent of legal rights and interests created by a written instrument, we must look to that State's parol evidence rule in deciding whether or not to exclude extrinsic evidence that bears on the disputed rights and interests under the instrument.

---

[2](...continued)
its unenforceability because of mistake, undue influence, fraud, duress, etc. * * *

In this case, our issue is not the rights created by the lease as written, which requires Nikki's to pay for tires, but whether there was a mistake in putting the provision as to payment in the lease.  However, we conclude that under California law, if it has application here, as under our "strong proof rule", parol evidence would be admissible to show that the provision in the lease for payment by Nikki's for tires was a mistake.

Under California law, where a mistake in a writing is put in issue, the parol evidence rule does not exclude evidence relevant to that issue.  Cal. Civ. Proc. Code sec. 1856 (West 1983); Stock v. Meek, 221 P.2d 15, 19-20 (Cal. 1950).  We, therefore, may properly consider the testimony of Kurt Caillier with respect to whether there was a mistake in the lease with respect to which company was required to furnish tires for the trucks petitioner leased from Nikki.

Under California law, the requirement of consent to a contract may be disproved by mistake.  Mistake may be either of fact or of law.  Cal. Civ. Code sec. 1576 (West 1982).  Mistake of fact is a mistake, not caused by the neglect of a legal duty on the part of the person making the mistake, and consisting of either an unconscious ignorance or forgetfulness of a fact material to the contract, or belief in the present existence of a thing material to the contract which is nonexistent.  Cal. Civ. Code sec. 1577 (West 1982).  Mistake must be proven by clear and

convincing evidence, and a preponderance of evidence is
insufficient.  Moore v. Vandermast, Inc., 119 P.2d 129, 130 (Cal.
1941); Martinelli v. Gabriel, 230 P.2d 444, 447 (Cal. Dist. Ct.
App. 1951); Taff v. Atlas Assurance Co., 137 P.2d 483, 485 (Cal.
Dist. Ct. App. 1943).

In this case, unlike the situation in numerous California
cases dealing with the issue of mistake, the parties seeking
relief from mistake are related companies.  Therefore, in this
case, it is more difficult to determine the true intent of the
parties at the time of contracting.  However, there is no
evidence in this case, as is later more fully pointed out, of the
circumstances surrounding the execution of the lease.

The only testimony here concerning a mistake in the lease is
the testimony of Kurt Caillier that he had always understood that
petitioner was to pay for the tires and not the lessor.  Kurt
Caillier testified that he did not read the contract carefully
when he signed it on behalf of the lessor since the contract was
between two of his related companies.  He did not explain who
drafted the lease or who told the drafter what provisions to
include.

Based on the evidence, we hold that petitioner has not met
its burden of proving that the tire replacement clause was
entered into by mistake.  The testimony of Kurt Caillier is the
only evidence as to the lease in the record.  His testimony is
unsupported by the terms of the lease and by identical language

in the leases between A&A and April Leasing, and between Elissa Leasing, and Stacey Leasing, and other companies owned and controlled by the Cailliers. The record does not show that petitioner deducted tire expenses for prior years or whether the other companies related to petitioner deducted tire expenses for years prior to 1990. Petitioner's prior two Federal income tax returns listed only truck maintenance expenses in general and did not specify any amounts as tire expenses, and petitioner offered no proof that prior purchases were made or deducted by petitioner. Respondent's agent, in reviewing the books and records of petitioner for years prior to 1990, found no payment of tire expense or deduction taken for such expense. Kurt Caillier testified that had he known that the tire replacement clause put the burden of providing tires on Nikki's, the lease rate would have been higher, but this statement was not supported by other evidence in the record, such as by lease rates of other companies or of petitioner's related companies. Petitioner has offered no evidence other than the testimony of Kurt Caillier.

There are numerous other deficiencies in the evidence. Kurt Caillier testified that he did not read the lease carefully before he signed it, but he did not testify as to who furnished the drafter of the lease with the information that caused this clause to be put in the lease.

The record shows that Mr. Chris Pisano, the general manager of petitioner, signed the truck rental lease on behalf of

petitioner. Mr. Pisano was a witness in this case, but he was not asked and did not state whether he understood that Nikki's was to pay for tires for any of the trucks it leased to petitioner when he signed the lease on behalf of petitioner. He did say that for petitioner's fiscal year ending in 1990, petitioner had its busiest time and leased about 48 trucks from Nikki's, and he also stated that he furnished to Kurt Caillier his estimate of the number of tires the trucks operated by petitioner would use in a year. However, he was not asked and did not testify as to the number of tires he determined would be used for the 48 trucks in a year. This lack of evidence is particularly important in evaluating whether there was a mistake in the lease agreement since petitioner was billed by Gillette Tire for 993 tires at a cost of $387,637.30, but an adjustment to the account was made on May 30, 1990. The inference from this adjustment is that petitioner was no longer liable for the charge for these tires.

The record also shows that it was not uncommon for one of the Caillier-owned corporations to pay expenses of another and make adjustments on the books of the corporations involved.

Not only is there no strong proof in this case that the provision that Nikki's pay for the tires on the trucks rented to petitioner was a mistake; the evidence as a whole indicates that it was not a mistake in the agreement the parties entered into.

Petitioner argues in a memorandum filed prior to the briefs in this case, but incorporated in petitioner's opening brief by reference, that, in the alternative, the parties subsequently modified the Nikki lease. Since the contract was not modified in writing until Agent Siebert pointed out to Kurt Caillier that the tire expenses were to be borne by the lessor under the contract, which occurred subsequent to the taxable year at issue in this case, petitioner argues that the parties modified the contract by an executed oral agreement. Cal. Civ. Code sec. 1698 (West 1982) states as follows:

> (a) A contract in writing may be modified by a contract in writing.
>
> (b) A contract in writing may be modified by an oral agreement to the extent that the oral agreement is executed by the parties.
>
> (c) Unless the contract otherwise expressly provides, a contract in writing may be modified by an oral agreement supported by new consideration. The statute of frauds * * * is required to be satisfied if the contract as modified is within its provisions.

While it is clear under California law that a written contract may be modified either by a subsequent written contract or by an executed oral contract, petitioner has offered no evidence whatsoever of either an oral agreement or of any new consideration. Kurt Caillier testified that until 1992 he was unaware of the provision in the lease that Nikki's pay for tires on the trucks leased to petitioner. This is contradictory to an oral agreement modifying the provision.

Based on the evidence in this record, we sustain respondent's disallowance of petitioner's claimed deduction for the cost of truck tires purchased in its fiscal year 1990.

Next at issue is whether petitioner is liable for an accuracy-related penalty pursuant to section 6662(b)(2). Section 6662(a) imposes an accuracy-related penalty of 20 percent on any portion of an underpayment of tax that is attributable to items set forth in section 6662(b). Section 6662(b)(2) specifies as one of those items "Any substantial understatement of income tax." An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return for the taxable year or for a corporation $10,000. Sec. 6662(d)(1)(B).

Section 6662(d)(2)(B) states that the amount of the understatement shall be reduced by the portion of the understatement which is attributable to the tax treatment of any item if there is or was substantial authority for such treatment, or if the relevant facts affecting the item's tax treatment are adequately disclosed on the return or in a statement attached to the return, and there is a reasonable basis for the tax treatment of such item. To determine whether the treatment of any portion of an understatement is supported by substantial authority, the weight of authorities in support of the taxpayer's position must be substantial in relation to the weight of authorities supporting contrary positions. Antonides v. Commissioner, 91

T.C. 686, 702-703 (1988), affd. 893 F.2d 656 (4th Cir. 1990); sec. 1.6662-4(d)(3), Income Tax Regs.

Petitioner has not shown that there was substantial authority for its position that the tire expense deduction was properly taken. On petitioner's return for the year at issue, the tire expense was included under the category "truck maintenance", but was not separately listed on the return. We hold that the tire expense deduction was not adequately disclosed on petitioner's return.

Section 6664(c)(1) provides that the penalty should not be imposed on any portion of an underpayment if the taxpayer shows reasonable cause for such portion of the underpayment and that he acted in good faith with respect to such portion. For the same reasons we conclude that petitioner has not shown that the provision of its contract with Nikki's that Nikki's pay for the cost of tires used on trucks leased to petitioner was a mistake, we conclude that petitioner has not shown reasonable cause for its understatement of tax.

We, therefore, sustain respondent's determination of the accuracy-related penalty under section 6662.

Decision will be entered under Rule 155.