MARK R. SWITZ, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Mark R. Switz, Inc. v. Commissioner
Docket No. 5216-76.
United States Tax Court
T.C. Memo 1979-162; 1979 Tax Ct. Memo LEXIS 363; 38 T.C.M. (CCH) 699; T.C.M. (RIA) 79162; April 24, 1979, Filed John C. Setright, for the petitioner. George W. Connelly, Jr., for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION HALL, Judge: Respondent determined the following deficiencies in petitioner's income tax: Taxable Year Ended
Deficiency
May 31, 1972
$ 15,764.73
May 31, 1973
17,342.76
May 31, 1974
26,395.94
*364 The issues in this case are whether petitioner is entitled to deductions under section 162(a)(3)[1] for annual rent in excess of $29,040, and if not, whether any portion of the amount disallowed as rent may be deducted under section 162(a)(1) by petitioner as compensation for personal services rendered. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioner, Mark R. Switz, Inc., is a New York corporation. From the time of petitioner's incorporation in 1966 until July 3, 1973, Mark R. Switz ("Mark") owned 400 shares and Mark's wife, Ethel, owned 100 shares of the 500 shares of stock issued and outstanding. On July 3, 1973, Mark transferred 200 of his shares to his daughters and sons-in-law. At the time the petition was filed, petitioner's principal place of business was North Syracuse, New York. Petitioner employs the cash method of accounting and a fiscal year ending May 31. Petitioner has operated the Switz Variety Store since July 1, 1967. Mark started Switz Variety Store in 1954 as a sole proprietorship. Switz *365 Variety Store owes its success to its emphasis on personal service to customers and to its offering a larger assortment of merchandise than its competitors. Switz Variety Store is located in the North Plaza Shopping Center in North Syracuse, New York. Mark originally leased the store premises for a term of ten years from the Van Epps, owners of North Plaza, for an annual rent of five percent of gross sales subject to a minimum rental of $6,500 for the first year, $6,850 for the second and third years, and $7,200 thereafter. On June 9, 1960, Mark executed a ten-year renewal lease with the Van Epps which provided for a fixed annual rental of $8,100 with no overage rent provision. Mark could not sublet or assign the lease without prior written consent of the lessors. North Plaza was sold by the Van Epps to Syracuse Savings Bank ("Syracuse Bank") on January 3, 1963. Syracuse Bank succeeded to the obligations and benefits of the Van Epps under the 1960 lease. Thereafter, Mark paid the rent to Syracuse Bank. On June 7, 1967, Mark's attorney wrote a letter to the president of Syracuse Bank advising the bank of the incorporation of the variety store business and requesting permission *366 from the bank to sublease the store's premises to petitioner. The bank gave its consent. On July 1, 1967, after the consent was obtained, Mark as lessor and petitioner as lessee executed a sublease providing for payment to Mark of an annual rental equal to five percent of petitioner's gross sales. All other terms of the sublease were the same as those contained in the June 1960 lease with the Van Epps. Between 1966 and 1969 it became apparent that the store needed more space. Negotiations for additional space were held between Mark on his own account and a vice-president of the Syracuse Bank and the bank's attorney on behalf of the bank. By June 1969 the bank had begun construction of additional space for the store and the parties had reached a verbal agreement on all terms except the amount of rent. The bank's vice-president and attorney drafted a new lease for the expanded premises which provided for an annual rent of $29,040. A copy of the lease was sent to Mark's attorney for review. Mark discussed the contents of the new lease with his attorney before signing it. The agreement provided in part: Parties THIS AGREEMENT, made this day of July 1969, between the SYRACUSE *367 SAVINGS BANK, a domestic banking corporation, with its principal office and place of business at 102 North Salina Street, Syracuse, New York of the first part, (hereinafter referred to as "Lessor") and MARK R. SWITZ, INC., a domestic corporation with its principal place of business at North Plaza at Route 11, North Syracuse, New York of the second part, (hereinafter referred to as "Lessee") * * *
Assignment and Subletting SECOND: This lease, or any part thereof, shall not be assigned, mortgaged or otherwise disposed of, nor shall the said premises, or any part thereof, be let or underlet, or used for any other purpose than above specified, by act of the Lessee, or by operation of law, or otherwise, without the prior written consent of the Lessor herein endorsed. The giving of such consent shall not authorize a further assignment or subletting without further consent, said consent will not be unreasonably withheld. * * *
Premises The Lssor hereby leases to the Lessee and the Lessee hereby hires from the Lessor the following: The existing premises occupied by the Lessee referred to in a prior lease between Robert H. VanEpps and Mark R. Switz by a lease dated June 9, 1960, as *368 Store 101-103 North Plaza. Hereinafter the lease of the existing premises is called the prior lease. Together with an additional premises of 4525 square feet to be constructed by Lessor adjoining the existing premises on the west and north, as shown on the plans and specifications attached hereto. Hereinafter the existing premises and the additional premises will be collectively referred to as the entire premises. Also the right to use the parking lot for the parking of vehicles of its customers in common with Lessor and other of the Lessor's tenants; and to use the driveway area in rear of the entire premises for loading and unloading purposes. Term With the appurtenances for a term to commence on the 1st day of October, 1969 and end on the 31st day of December, 1980. This term is also deemed to commence if the Lessee also elects pursuant to paragraph FOURTEENTH infra. Rental The Lessee covenants and agrees to pay to Lessor during the duration of said term rent at the rate of $29,040 per year. This rent shall be paid in advance in monthly installments of $2,420 on the 1st day of each month during the term of this lease. * * *
TWELFTH: Lessor grants to the Lessee *369 the right to renew this lease for one renewal period of 5 years, to commence on January 1, 1981 and to expire on December 31, 1985. The terms and conditions during the renewal term shall be as set forth herein except the Lessee agrees to pay to the Lessor by way of rental for the entire premises annually a sum equal to 5% of the Lessee's annual gross sales sold in, on, upon or from said premises during said occupancy, but in any event to pay a guaranteed minimum rental of Twenty-nine Thousand and Forty Dollars ($29,040.00) per year, * * * * * *
The term "gross sales" as herein used shall in all cases be taken to mean and include total gross sales prices of any and all merchandise, goods, and wares of any kind, sort, or nature whatever, sold in, from, through, or upon the demised premises or any part thereof, and shall include the amounts of any and all charges for any and all services rendered or performed for which any charges are or may be made in, from, through or upon the demised premises or any part thereof, whether said sales or services are made, rendered, or performed by Lessee directly or indirectly, by or through any departments, or by any other person, persons, party *370 or parties selling merchandise and/or performing services of any kind, and whether said sales or services are wholesale or retail, and shall include orders taken at or through the demised premises but filled or services performed from or at any other location, and whether said sales or services are for cash or credit, and regardless of collection in the case of the latter. * * * * * *
SIXTEENTH: The Lessee agrees that all moving of counters, its merchandise and its equipment before, during and after the construction set forth in this agreement shall be done at its own expense. * * *
NINETEENTH: The Lessor will use its best efforts when new leases are entered into between itself and Lessees in North Plaza to restrict the Lessee and its employees parking to the rear and side of North Plaza. The Lessee, for itself and its employees, does hereby agree that they will park to the rear and side of the North Plaza. * * *
On July 17, 1969, Mark went to the main branch of the Syracuse Bank to sign the lease. Although he had the opportunity, Mark did not read the lease before signing it. Mark signed the lease, "Mark Switz, Inc. by Mark R. Switz, Pres." Mark's signature *371 was witnessed by his attorney and the bank's attorney although they were not present when Mark signed the lease. Sometime later the president of the bank signed the agreement on behalf of the bank. A drawing of petitioner's corporate seal which includes petitioner's name and the year of incorporation also appears on the lease. The bank's attorney's notarization of the document includes the following: On this 17th day of July, in the year one thousand nine hundred and sixty-nine before me personally came Mark R. Switz to me known, who, being by me duly sworn, did depose and say; that he resides [at] 108 David Drive, North Syracuse, New York; that he is the President of MARK R. SWITZ, INC. the corporation described in and which executed the above instrument; that he knows the corporate seal of said corporation; that the seal affixed to said instrument is such corporate seal; that it was so affixed by order of the Board of Directors of said corporation, and that he signed his name thereto by like order. On July 20, 1969, three days after Mark signed the lease, petitioner's Board of Directors resolved that petitioner enter into a revision of its sublease with Mark, whereby petitioner *372 would lease the expanded premises at an annual rent of six percent of annual gross sales, payable monthly. Three days later petitioner and Mark executed a sublease for the same term as the bank lease. Mark did not obtain a written consent to sublease the premises to petitioner from Syracuse Bank. During the years in issue, $29,040 represented a fair, reasonable and arm's-length rent for the store premises. A few years later the need for expansion again arose and in 1974 the store's premises were again expanded. On May 21, 1974, Syracuse Bank and Mark, individually, executed a new lease, effective August 1, 1974, covering the expanded premises at a new annual rental of $69,178. Mark subleased the premises to petitioner on July 18, 1974 for an annual rent of seven percent of annual gross sales. During 1975 petitioner was audited by respondent with respect to the years in issue. At one of these meetings, the Revenue Agent pointed out to Mark that petitioner was named as the lessee on the July 1969 lease with Syracuse Bank. At that time Mark wrote on petitioner's copy: This lease is not right Should be with me The Corp. is a subtenant On February 24, 1977, Mark and the *373 then president of Syracuse Bank executed a new lease reflecting another addition to the store's premises and a corresponding increase in rent. That lease contained the following paragraph: This lease is given for the purpose of correcting an error in a lease dated July 17, 1969, wherein the lessee was referred to as MARK R. SWITZ, INC., said Mark R. Switz, Inc., having entered into said Lease as Lessee by mistake. The members of petitioner's Board of Directors since incorporation have been Mark, his wife Ethel, and Bertel Schmidt ("Bert"), their son-in-law. Contrary to petitioner's corporate by-laws, which call for the election of directors by a majority vote of the shareholders, Bert and Ethel were appointed to the Board by Mark. At all times material to this case, Mark was president of petitioner, Ethel was vice-president and treasurer, and Bert was secretary. Ethel and Bert were compensated by petitioner for their personal services as officers; Mark was not. Bert was general manager of the store and in charge of daily operations. Mark, however, had the final decision on business matters. Petitioner has never paid Mark a salary. Petitioner did not deduct any of the *374 payments made to Mark during the years 1967 through 1974 as compensation for services rendered, nor was Mark listed as an employee on Forms 940 and 941 filed by petitioner during the years in issue. Mark reported all payments received by petitioner during the years in issue as rental income. During the years in issue, the Board of Directors did not declare any dividends. Petitioner's gross sales between 1968 and 1973 were as follows: Calendar Year
Gross Sales
1968 $ 520,249
1969
574,774
1970
876,194
1971
1,066,117
1972
1,020,352
1973
1,126,795
During the years in issue, Mark paid the following amounts to Syracuse Bank and petitioner paid the following amounts to Mark pursuant to the lease and sublease agreements: Taxable Year Ending
Payment from Mark
Payment from Peti-
to Syracuse Bank
tioner to Mark
May 31, 1972
$ 29,040
$ 61,883.15
May 31, 1973
29,040
65,170.75
May 31, 1974
29,040
84,031.55
On its income tax returns for its taxable years ending May 31, 1972, 1973 and 1974, petitioner claimed deductions of $61,883.15, $65,170.75 and $84,031.55, respectively, for rent paid to Mark. Respondent in his statutory *375 notice determined that deductions in excess of the $29,040 paid to Syracuse Bank each year pursuant to the terms of the July 1969 lease were not required to be paid as a condition to the continued use of the store's property. Accordingly, respondent disallowed $32,843.18, $36,130.75 and $54,991.55 of the claimed 1972, 1973 and 1974 rental deductions. On September 26, 1975, Mark's attorney filed a protest letter on behalf of petitioner with respect to respondent's determination of a deficiency based on this audit. In the protest petitioner relied on the fact that the amounts paid to Mark by petitioner in excess of $29,040 represented compensation for personal services. Contrary to Mark's testimony, petitioner did not rely on the fact that the excess expenditures represented rental payments. OPINION From 1954 until June 28, 1966, Mark R. Switz ("Mark") operated Switz Variety Store as a sole proprietorship. On June 28, 1966, the business was incorporated as Mark R. Switz, Inc. (petitioner in this case). Initially Mark leased the store's premises from the Van Epps. In 1963 Syracuse Savings Bank ("Syracuse Bank") succeeded as owner and lessor of the premises. Shortly after *376 petitioner-corporation was formed, Mark, with the consent of Syracuse Bank, subleased the premises to petitioner for five percent of petitioner's annual gross sales. The premises were eventually expanded and on July 17, 1969, about one year before the expiration of Mark's lease and petitioner's sublease, a new lease was executed naming Syracuse Bank as lessor and petitioner Mark R. Switz, Inc. (not Mark) as lessee. The annual rent specified under this new lease was $29,040. Six days thereafter Mark executed what purports to be a new sublease with petitioner providing for an annual rent of six percent of gross sales. For taxable years ending May 31, 1972, 1973 and 1974, Mark received $61,883.15, $65,170.75 and $84,031.55, respectively, as rent from petitioner. The question here is whether petitioner is entitled to deductions for annual rent in excess of $29,040. Section 162(a)(3) provides that there shall be allowed as deductions all ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including "rentals or other payments required *377 to be made as a condition to the continued use or possession, for purposes of the trade or business, of property * * *." Petitioner contends that Mark was the real party to the lease with Syracuse Bank. Accordingly, petitioner asserts that the total payments made by petitioner to Mark under the sublease are deductible. Respondent, on the other hand, contends that petitioner, not Mark, was the real party to the lease with Syracuse Bank, and therefore amounts paid to Mark in excess of the $29,040 annual rental specified in the lease were not required to be made as a condition to the continued use of the property. Respondent first asserts that petitioner should not be permitted by parole evidence to prove that the substance of the agreement with Syracuse Bank was other than what appears in the written lease. Generally, when either a taxpayer or respondent has attempted to introduce extrinsic evidence with regard to the terms of the contract, we have held that, because respondent was not a party to the contract, neither he nor the taxpayer may rely on the parole evidence rule to exclude extrinsic evidence so offered. Estate of Craft v. Commissioner,68 T.C. 249, 260 (1977), *378 on appeal (5th Cir. Nov. 18, 1977). [2] We are not here interested in the parties' legal rights under the contract, but with the proper tax treatment of amounts paid under the contract. This is the type of situation where we allow liberal admission of extrinsic evidence in order that we may base our decision on the substance of the documents rather than the form. Estate of Craft,supra at 263. *379 Here petitioner contends that a mutual mistake occurred when the parties' intended agreement was reduced to writing. The lease was negotiated by Mark and by the bank's vice-president and attorney on behalf of Syracuse Bank. At the time of trial, the vice-president was retired from the bank but lived in the Syracuse area; the attorney was still retained by the bank. Petitioner did not offer the testimony of either of these men nor any reason for failure to do so. When the negotiations were completed, the lease was drafted by the bank's vice-president and attorney. Petitioner Mark R. Switz, Inc. was specifically named as lessee. No evidence was presented that Syracuse Bank refused to accept petitioner as the lessee. Furthermore, the language used in the lease contemplated the corporate rather than an individual lessee. For example, the lease refers to the use of the parking lot by customers of the lessee, the "lessee's annual gross sales," and movement by the lessee of "counters, its merchandise and its equipment" and conducting of "business operations" by the lessee. After the draft of the lease was completed, a copy was sent to Mark's attorney. Prior to the signing of the *380 lease, Mark discussed its contents with his attorney. Petitioner did not present the testimony of Mark's attorney at trial nor any evidence indicating that the attorney objected to the lease as written. On July 17, 1969, Mark went to the main office of Syracuse Bank to sign the lease. He signed as "Mark R. Switz, Inc. by Mark R. Switz, Pres." Sometime later the president of the bank signed the lease on behalf of the bank. Petitioner upon deposition of the president did not elicit whether he intended for Mark or petitioner to be the lessee. Mark's attorney and the bank's attorney later witnessed the signatures apparently without objection. A drawing of a corporate seal also appears on the lease. This drawing includes petitioner's name and year of incorporation. The bank's attorney's notary public acknowledgement of the lease states in part that on July 17, 1969: * * * before me personally came MARK R. SWITZ to me known, who, being by me duly sworn, did depose and say; that he resides at 108 David Drive, North Syracuse, New [York;] that he is the President of MARK R. SWITZ, INC. the corporation described in and which executed the above instrument; that he knows the corporate *381 seal of said corporation; that the seal affixed to said instrument is such corporate seal; that it was so affixed by order of the Board of Directors of said corporation, and that he signed his name thereto by like order. Mark testified that he did not draw the seal on the agreement nor was it the official seal of petitioner. He was not, however, able to explain who might have drawn the seal or how anyone else would have known the year of incorporation. All of the above evidence indicates that petitioner was the lessee. Petitioner contends, however, that in fact Mark was the lessee. First, petitioner contends that Mark did not have petitioner's authority to enter into a lease with Syracuse Bank. We disagree, for under New York law Mark as president has the implied power to perform all acts of an ordinary nature which are incident to his office. Goldenberg v. Bartell Broadcasting Corp.,47 Misc. 2d 105, 262 N.Y.S. 2d 274 (New York County Sup. Ct. 1965). Second, as evidence that Mark was the actual lessee, petitioner points to the fact that in June 1967 the president of Syracuse Bank signed a consent on behalf of the bank allowing Mark to sublet the premises *382 to petitioner. The consent signed by the president, however, was executed with respect to the June 1960 lease between Mark and the Van Epps, prior owners of the premises. It was signed two years before the lease in issue was executed. Third, petitioner contends that corporate minutes authorizing petitioner to sublease the premises from Mark and the actual sublease agreement between petitioner and Mark indicate that Mark was the real lessee. [3] This sublease supports petitioner's contention that Mark, not petitioner, was the intended lessee in the July 1969 lease with Syracuse Bank. But Mark cannot explain why he wrote in long hand the corporate name "by Mark R. Switz, Pres.," or why neither his attorney nor the bank's attorney pointed out the "error" in the lease when they witnessed his signature in that form. In 1975, during an audit of petitioner's tax returns for the fiscal years in issue, the Revenue Agent pointed out to Mark that the 1969 lease named petitioner *383 as lessee. Mark then wrote at the top of petitioner's copy: This lease is not right Should be with me The Corp. is a subtenant The protest letter filed by Mark's attorney on behalf of petitioner on September 26, 1975, with respect to respondent's determination based on the audit does not state that any error was made in drafting the 1969 lease. Petitioner's only argument was that the amounts paid by petitioner in excess of the $29,040 rent were compensation to Mark for personal services and not distributions of corporate earnings as respondent alleged. In 1977, after an addition to the premises was constructed, a new lease was executed between Mark, individually, and the then president of Syracuse Bank. The following paragraph appears typed on the lease: This lease is given for the purpose of correcting an error in a lease dated July 17, 1969, wherein the lessee was referred to as MARK R. SWITZ, INC., said Mark R. Switz, Inc. having entered into said Lease as Lessee by mistake. Although petitioner contends that this paragraph proves that the July 17, 1969, agreement was intended to be between Syracuse Bank and Mark, we do not find this argument persuasive. The president *384 of the bank who executed the 1977 lease was not the same president of the bank who executed the 1969 lease nor was he present during the negotiations. We do not know the circumstances surrounding the addition of this paragraph in 1977 nor why the then president may have agreed to its inclusion. We do know, however, that the lease was executed after petitioner commenced proceedings before this Court, at a time when the importance of proving that Mark was the intended lessee of the July 1969 lease was clear, and approximately two years after the audit of petitioner's tax returns for the years in issue. In light of the above facts, we decide that petitioner who bears the burden of persuasion has failed to carry that burden here. Therefore, we conclude that petitioner was the real party to the July 1969 lease with Syracuse Bank. Pursuant to this lease, petitioner was required to pay Syracuse Bank $29,040 for the continued use and possession of the store premises. During the years in issue no additional payments were required to be made as a condition to the continued use of the property. Accordingly, petitioner's deduction for rent under section 162(a)(3) is limited to $29,040. *385 Even if we had been persuaded by petitioner that Mark and not petitioner was the lessee of the premises under the July 1969 lease with Syracuse Bank, we would hold for respondent on the rent issue on the grounds that $29,040 represents an arm's-length rent for the premises and the additional money paid by petitioner to Mark was something other than rent. Section 162(a)(3) does not specifically limit deductions for rent to a "reasonable" amount, as in the case of compensation. What is required is that the amount be in fact rent rather than something else paid under the guise of rent. "When there is a close relationship between lessor and lessee and in addition there is no arm's length dealing between them, an inquiry into what constitutes reasonable rental is necessary to determine whether the sum paid is in excess of what the lessee would have been required to pay had he dealt at arm's length with a stranger." Place v. Commissioner,17 T.C. 199, 203 (1951), affd. 199 F.2d 373 (6th Cir. 1952), cert. denied 344 U.S. 927. Accord, Davis v. Commissioner,26 T.C. 49 (1956); *386 Stanwick's, Inc. v. Commissioner,15 T.C. 556 (1950), affd. per curiam 190 F. 2d 84 (4th Cir. 1951). The relationship between Mark and petitioner is a close one. He is the founder of the business and was the 80 percent shareholder of petitioner until 1973 when he made gifts of some of his stock to his daughters and their husbands. Thereafter he remained a 40 percent shareholder; his wife has owned another 20 percent since the formation of the corporation. Mark was president and chairman of the Board of petitioner. Moreover, he generally remained in charge of petitioner's business. Clearly the negotiations between Mark and petitioner with respect to the sublease were not at arm's length. The rent under the July 1969 sublease was equal to six percent of gross sales. Mark knew what those sales were when he entered into the sublease and he expected those sales to increase, which they did. He knew that he could expect the rent from petitioner well in excess of what he had to pay Syracuse Bank. The basic term of the main lease and the sublease are identical; they cover the same premises. Every significant burden placed on the main lessee was passed *387 on to the sublessee. However, the right to renew on predetermined terms was not carried over to the sublease. Mark as a director of petitioner was bound as a fiduciary to give every advantage to petitioner. See Utter-McKinley Mortuaries v. Commissioner,225 F. 2d 870 (9th Cir. 1955), affg. a Memorandum Opinion of this Court. See Equity Corporation v. Groves,294 N.Y. 8, 60 N.E. 2d 19 (1945); Application of Vogel,25 App. Div. 2d 212, 268 N.Y.S. 2d 237 (1966), affd. 19 N.Y. 2d 589, 278 N.Y.S. 2d 236, 224 N.E. 2d 738 (1967). However, he had petitioner pay him annual rent of $61,883, $65,171, and $84,031 during each of the taxable years in issue instead of the $29,040 rent which he contracted to pay Syracuse Bank in an arm's-length agreement. Mark gave petitioner nothing additional to cause this increased rent. The rent paid Mark by petitioner was excessive. We are not persuaded by the two valuation reports and testimony of petitioner's expert that a reasonable rent was higher than agreed to by two unrelated parties dealing at arm's length. To the extent the payments called for under the sublease exceeded the rent *388 in the main lease with Syracuse Bank, the payments to Mark are not deductible as an ordinary and necessary business expense. Utter-McKinley Morturary v. Commissioner,supra.
Petitioner makes the alternative argument that if the amounts in excess of $29,040 are not deductible as rent, they are deductible as compensation paid for Mark's personal services. Respondent contends that these payments to Mark are not deductible since they were neither paid nor intended as compensation, and we agree. The test of deductibility for compensation payments is whether they are reasonable and are in fact paid purely for services. Section 1.162-7(a), Income Tax Regs. The payment must be paid and intended as compensation. Jefferson Block & Supply Co. v. Commissioner,59 T.C. 625, 633-634 (1973), affd. 492 F. 2d 1243 (6th Cir. 1974). Whether this intent has been shown is a factual question to be decided on the basis of the particular facts and circumstances of the case. Electric & Neon, Inc. v. Commissioner,56 T.C. 1324, 1340 (1971), *389 affd. without opinion 496 F. 2d 876 (5th Cir. 1974). The burden of proof is on petitioner, Welch v. Helvering,290 U.S. 111 (1933). Petitioner has failed to carry its burden here. In this case, the payments were made pursuant to a subleasing agreement wherein they were called rent. During the years in issue the payments were deducted by petitioner as rent; they were not included on petitioner's employment tax return. The exact amounts paid were tied to the sales of petitioner, and they bore no relation to the quality or amount of services performed by Mark. Mark reported the payments as rental income. Furthermore, Mark was not authorized a salary by petitioner's Board of Directors whereas compensation for other corporate officers was specifically authorized. In light of these facts, we conclude that petitioner has not shown that the amounts paid to Mark as rent were intended as compensation. Petitioner asserts, citing Commissioner v. Multnomah Operating Co.,248 F. 2d 661 (9th Cir. 1957), affg. a Memorandum Opinion of this Court, that the Tax Court has jurisdiction to allow the excess payment as a deduction for compensation *390 regardless of nomenclature. That case, however, is distinguishable. In Multnomah there was a question of fact as to whether the disputed payments were intended as rent or compensation. Here, in contrast, there is no serious question that the excess payments were intended to be other than rent. The payments were not intended as compensation to Mark for services rendered and are not deductible as such. Accordingly, we need not determine the reasonableness of the amount of compensation. In light of the foregoing, Decision will be entered for the respondent.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect during the years in issue.↩
2. Respondent urges us to adopt the rule in Commissioner v. Danielson,378 F. 2d 771, 775 (3d Cir. 1967), vacg. and remg. 44 T.C. 549 (1965), cert. denied 389 U.S. 858 (1967), wherein the Court of Appeals for the Third Circuit stated: [A] party can challenge the tax consequences of his agreement as construed by the Commissioner only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc. Alternatively, respondent urges us to adopt the rule of the Second Circuit in Ullman v. Commissioner,264 F. 2d 305 (2d Cir. 1959), affg. 29 T.C. 129 (1957), which required "strong proof" to establish the substance of a contract involving a covenant not to compete was different than its form. In both Danielson v. Commissioner,supra, and Ullman v. Commissioner,supra, the issue was whether a clause in the contract was a covenant not to compete. As the Court explained in Ullman,264 F. 2d at 308: The tax avoidance desires of the buyer and seller in such a situation are ordinarily antithetical, forcing them, in most cases, to agree upon a treatment which reflects the parties' true intent with reference to the covenants, and the true value of them in money. In contrast, in this case the issue is whether Mark or petitioner was the contracting lessee--the tax consequences to Syracuse Bank are not dependent upon our determination. Respondent is not confronted with the necessity for litigation against both the lessor and the lessee in order to collect the taxes properly due. See Danielson v. Commissioner,supra. Neither the Danielson nor the Ullman↩ rule is appropriate in this case.
3. The fact that the sublease may have been enforceable under state law is irrelevant to the question of whether the payments are deductible as rent. Deputy v. Dupont,308 U.S. 488↩ (1940).