ROBERT G. YOUNG, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Young v. Commissioner
Docket No. 1173-83.
United States Tax Court
T.C. Memo 1985-221; 1985 Tax Ct. Memo LEXIS 406; 49 T.C.M. (CCH) 1439; T.C.M. (RIA) 85221; May 9, 1985. Allen J. Gordon, for the petitioner. Scott Anderson, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined a deficiency in petitioner's 1978 Federal income tax and an addition to tax under section 6653(a) [1] in the amounts of $19,291.00 and $964.55, respectively. The issues [2] for decision are: (1) The amount of gain petitioner realized on the sale or exchange of real property, which depends on petitioner's adjusted basis in the property at the time of the transaction; (2) Whether petitioner must recognize such gain in 1978 or can defer recognition of the gain in this transaction as a like-kind exchange under *409 section 1031; and (3) Whether petitioner is liable for the addition to tax under section 6653(a). *410 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The first and second stipulations of facts and the exhibits attached thereto are incorporated herein the this reference. Petitioner resided in Virginia Beach, Virginia, at the time he filed his petition in this case. Petitioner timely [3] filed his 1978 Federal individual income tax return (Form 1040) with the Internal Revenue Service Center in Memphis, Tennessee. His filing status was that of a married person filing a separate return. Petitioner is a native of Floyd County, Virginia, which is located in the rural Blue Ridge Mountain region of Virginia. Petitioner's formal education included the sixth grade; he entered but did not complete the seventh grade. Sometime before 1953, petitioner moved from Floyd County to Virginia Beach, *411 Virginia. In Virginia Beach petitioner worked as a carpenter, building houses primarily. Sometime during the first half of 1953, petitioner decided to buy some land in Floyd County in case he wanted to move back there some day. Petitioner told an acquaintance in Floyd County, Dock Dickerson (Dickerson), that if he could find some property there that petitioner could buy, he would give Dickerson part of it "for his trouble." Soon thereafter, Dickerson reported to petitioner that he had located a parcel of real estate that petitioner might be interested in. As soon as he could, petitioner traveled to Floyd County, inspected the property, and discussed with the owner the purchase of the land. Petitioner bought this property, consisting of approximately 164.5 acres in the Court House Magisterial District of Floyd County, Virginia (the Virginia property). He acquired the property by a deed dated June 19, 1953, from Edd S. Rakes and Catherine M. Rakes (the Rakes) to petitioner and his wife, Jean D. Young, as tenants by the entirety. [4] Petitioner paid the Rakes $10,000 cash and a promissory note in the amount of $14,900. The note was co-signed by Dickerson, but it was not otherwise *412 secured or recorded as a lien against the property. Only the $10,000 cash payment was recited in the deed as the consideration therefor. Petitioner also owned a *413 house located in an area known as Elizabeth River Shores, which is now within the city limits of Virginia Beach, Virginia. Sometime after petitioner purchased the land in Floyd County, he sold the Virginia Beach house and used the proceeds from that sale to pay in full the $14,900 note he had given to the Rakes. Dickerson did not pay any portion of the note. Shortly after paying off the note petitioner transferred to Dickerson 44.1 acres [5] of the Virginia property as a finder's fee or broker's commission for locating it. Petitioner received no additional consideration from Dickerson for this parcel. Sometime during 1963 petitioner sold approximately 15 acres of the Virginia property to the Floyd County School Board for $5,400. [6] Shortly thereafter petitioner *414 made a number of capital improvements to the remainder of the Virginia property. These improvements included leveling off a portion of the property as well as putting in an access road, drainage ditches, and drainage pipes. Petitioner paid the contractor who did the work $6,900, consisting of the $5,400 petitioner received from the Floyd County School Board plus an additional $1,500 of petitioner's separate funds. Sometime during 1978 petitioner had an accident with a chain saw that injured his foot and precluded him from continuing to work as a carpenter. After his convalescence from this accident, petitioner decided to try to support himself by cutting and selling firewood. The Virginia property was heavily wooded with timber suitable for firewood. However, petitioner did not think he could profitably exploit that timber because the property was too far away, some 300 miles from Virginia Beach, his best potential market. Petitioner decided to trade the Virginia property for similar real estate located closer to Virginia Beach so that he could profitably sell firewood *415 from such timberland. Shortly after reaching this conclusion, petitioner found a parcel of suitable land in Currituck County, North Carolina (the North Carolina property). Currituck County is just across the North Carolina State line, approximately eight miles from petitioner's residence. Petitioner called the owners of the North Carolina property, James H. Ferebee, Sr., and James H. Ferebee, Jr. (the Ferebees), to inquire if the land was for sale. The Ferebees referred petitioner to Mary Louise Chappell (Chappell), the real estate agent who was handling the sale of their land. Petitioner contacted Chappell during the summer of 1978 and asked her if she thought the Ferebees would be interested in trading the North Carolina property for his Virginia property. After discussing petitioner's proposal with the Ferebees, Chappell told petitioner that they would not trade properties because the Virginia property was too far away and they were interested in selling land, not buying land. Sometime before September 7, 1978, petitioner again spoke with Chappell about a possible trade of his Virginia property for the Ferebees' North Carolina property. Chappell repeated their refusal *416 to trade. After further negotiations during that conversation, petitioner agreed to offer to purchase the North Carolina property for $100,000. At that time petitioner signed an offer to purchase and contract (the offer to purchase and contract), reflecting the offer and gave Chappell at $5,000 earnest money deposit. [7] Pursuant to the offer to purchase and contract, petitioner's $5,000 earnest money deposit was to be credited against the $100,000 purchase price. The balance was to be paid at the closing, $80,000 by cash and $15,000 by a secured promissory note payable June 1, 1979. However, petitioner made it clear to Chappell, and she agreed, that petitioner's offer was conditioned on his selling his Virginia property and using the proceeds of the sale to make the purchase. In response to petitioner's inquiry during the negotiations, Chappell told petitioner that it was her understanding that his sale of the Virginia property and immediate use of the proceeds to buy the North Carolina property would be tax free because, as she saw it, petitioner was essentially exchanging timberland in Virginia for timberland in North Carolina. *417 Pursuant to a contract (the sales contract) dated September 7, 1978, petitioner agreed to sell his Virginia property [8] to the Trurmans, husband and wife, for $90,000, and received an earnest money deposit in the amount of $5,000. On October 10, 1978, the sale [9] was closed and petitioner received a check for the net settlement proceeds in the amount of $84,242.63 (the sale proceeds). At the closing, petitioner asked the closing attorney, Warren G. Lineberry (Lineberry), what the tax consequences of his sale of the Virginia property and reinvestment of the sale proceeds in the Noth Carolina property would be. Lineberry responded that the transactions should be tax free. *418 On October 26, 1978 the Ferebees accepted petitioner's offer to purchase the North Carolina property for $100,000. The purchase was consummated on November 27, 1978. At the closing petitioner delivered the check for the sale proceeds he received for the Virginia property to Chappell as part of the payment required by the offer to purchase and contract. [10] In response to petitioner's inquiry, the closing attorney, a Mr. Brumsey, told petitioner that his real estate transactions would be tax free. From the outset petitioner intended that his sale of the Virginia property followed by his purchase of the North Carolina property qualify for tax-free treatment and he would not have entered into those transactions if he had known they did not. *419 During 1978, petitioner and his counsel, Allen J. Gordon (Gordon), were partners in a partnership that owned a six-unit apartment building. Despite their partnership, petitioner was in contact with Gordon infrequently during 1978. Petitioner did not seek Gordon's advice about the tax consequences of petitioner's 1978 real estate transactions until after he had met with respondent's agent regarding the deficiency herein. On his 1978 return petitioner reported only a loss from the partnership with Gordon in the amount of $710.42. The return contained no information regarding petitioner's 1978 real estate transactions. In his statutory notice of deficiency date October 28, 1982, respondent determined that petitioner realized and should have recognized a capital gain on the sale of the Virginia property in the amount of $79,712, determined as follows: Amount realized
$90,000
Less: cost basis
$10,000
selling expenses
288
10,288
Capital gain
$79,712
Respondent also determined that petitioner was liable for the negligence addition provided by section 6653(a). OPINION I Gain Realized - Adjusted Basis of the Virginia Property
Under *420 section 1001(a), "gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in section 1011 for determining gain." Section 1001(b) provides that "[t]he amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received." Generally, the adjusted basis for determining gain or loss from the sale or other disposition of property is the cost of the property adjusted as provided in section 1016. Secs. 1011(a) and 1012. Section 1016(a)(1) requires that proper adjustment be made for expenditures, receipts, losses, or other items, properly chargeable to capital account, including the cost of improvements and betterments made to the property. Sec. 1016(a)(1); sec. 1.1016-2(a), Income Tax Regs. Petitioner bears the burden of proof in this proceeding. Welch v. Ehlvering,290 U.S. 111 (1933); Rule 142(a). The parties agree that the amount petitioner realized on the sale of the Virginia property was $90,000. Sec. 1001(b). They disagree on petitioner's adjusted basis in the property at the *421 time of sale. Petitioner argues that his adjusted basis was $26,900, calculated as follows: (1) Cost basis of $24,900, consisting of the $10,000 cash petitioner paid the Rakes and the $14,900 promissory note petitioner gave the Rakes and later paid off with the proceeds from the sale of the Virginia Beach property; plus
(2) $2,000 for the amount of cash petitioner allegedly paid out of his own pocket for capital improvements made on the Virginia property in 1963. On the other hand, respondent contends that only the $10,000 cash petitioner paid for the Virginia property, which was the only consideration recited in the deed, should be included in his adjusted basis. Respondent concedes, however, that petitioner's gain on the sale should also be reduced by selling expenses in the amount of $288. After carefully considering the evidence of record as a whole and the parties' arguments, we have determined that petitioner's adjusted basis in the Virginia property at the time of the sale to the Turmans was $28,697.85, as set forth and explained below. Petitioner testified that he paid the Rekes $10,000 in cash and gave them an unsecured, unrecorded, but co-signed promissory note *422 in the amount of $14,900 for the Virginia property. Petitioner further testified that shortly thereafter he sold his Virginia Beach house and used the sale proceeds to pay off the promissory note. Respondent's primary argument is that petitioner's bare testimony does not satisfy petitioner's burden of proof. However, we found petitioner to be a candid and forthright, it somewhat inarticulate witness, and we found his testimony wholly worthy of belief. Petitioner's testimony was essentially uncontradicted. [11] Respondent suggests that petitioner's failure to offer documentary evidence of the conveyance of the Virginia Beach property petitioner sold to pay off the promissory note is evidence that no such conveyance took place, citing Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158 (1946), affd. 162 F. 2d 513 (10th Cir. 1947), and Pollack v. Commissioner,47 T.C. 92 (1966), affd. 392 F. 2d 409 (5th Cir. 1968). Those cases state that the normal inference to be drawn from a party's failure to present the testimony of a readily available witness or other evidence in his possession is that such evidence would *423 have been unfavorable. Pollack v. Commissioner,supra,47 T.C. at 108; Wichita Terminal Elevator Co. v. Commissioner,supra,6 T.C. at 1165. That rule does not apply in this case. During respondent's cross examination of petitioner, petitioner's counsel offered respondent's counsel a copy of the conveyance if the latter desired to offer it into evidence. While it is unfortunate that petitioner's counsel did not think it useful to offer the document into evidence, we think his obvious villingness to allow respondent's counsel to do so and petitioner's credibility are sufficient to overcome the usual inference that we may draw from a party's failure to present readily available evidence. The evidence in this instance was readily available to both parties. Thus, we draw no negative inference *424 from petitioner's failure to introduce the conveyance into evidence, and do not consider it, as respondent suggests, evidence that no such conveyance took place. [12] We reach a similar conclusion as to the conveyance to Dock Dickerson of a portion of the land acquired in 1953. Furthermore, we think the informality of these 1953 transactions in Floyd County, Virginia, as described by petitioner, is entirely consistent with the rural setting and practices of perhaps a by-gone day in that area of Virginia. Thus, based on the record as a whole, we find that petitioner had a cost basis in the Virginia property of $24,900. [13]
Apparently to attack petitioner's credibility, respondent asserts that "[i]f, in fact, *425 the petitioner paid $24,900 for the * * * [original Virginia property], he evaded Virginia Recording Taxes by fraudulently stating in the deed that the consideration paid for the property was $10,000." Respondent refers to Virginia Code sections 58-54 and 58-54.1 (1974), [14] which impose a state recordation tax and an additional tax on the recording of deeds, the amounts of which are determined with reference to "the consideration of the deed or the actual value of the property conveyed, whichever is greater." Respondent does not cite nor have we found any authority holding that the failure to recite the full consideration in the deed constitutes fraudulent evasion of the Virginia recordation taxes. Moreover, the measure for the tax is the consideration stated in the deed or the actual value of the property conveyed. Thus, the statute on its face contemplates the possibility that the tax would be based on an amount other than the consideration recited in the deed. Suffice it to say, our opinion of petitioner's credibility is unswayed by respondent's unsupported attack. *426 Respondent also argues on brief that the parol evidence rule "prohibits the petitioner from claiming that he paid * * * [the Rakes] more than the $10,000 recited in the deed." We find this argument somewhat curious in view of the fact that respondent did not raise a parol evidence rule objection to petitioner's testimony at any time during the trial. In any event, respondent contends that we must apply the Virginia parol evidence rule and that under that rule petitioner's testimony is inadmissible because it is inconsistent with the deed's recital, citing Estate of Craft v. Commissioner,68 T.C. 249 (1977) (Court reviewed), affd. per curiam 608 F. 2d 240 (5th Cir. 1979), and Davis v. Marr,200 Va. 479, 106 S.E. 2d 722 (1959), respectively. In Estate of Craft, we stated (68 T.C. at 260-261) that we have followed two approaches in applying the parol evidence rule in this Court. Under the "third-party to the instrument rule" we have held that "because respondent was not a party to the instrument involved, neither he nor petitioner may successfully rely on the rule to exclude extrinsic evidence offered by the other. *427 " Estate of Craft v. Commissioner,supra,68 T.C. at 260, and cases cited therein. We have at other times "looked to and followed the applicable State law regarding the admissibility of extrinsic evidence." Estate of Craft v. Commissioner,supra,68 T.C. at 261, and cases cited therein.After enunciating these two rules, we held (68 T.C. at 262-263) that when the issue involved requires a determination of legal rights and property interests under state law we must look to the state's parol evidence rule because that term is a misnomer; "the rule is one of substantive law and not one of evidence." [Citations omitted.] Nevertheless, we acknowledged in Estate of Craft,supra,68 T.C. at 263, the continuing vitality of the "third-party to the instrument rule" in cases that did not involve "a determination of legal rights or property interests under State law but rather concerned the proper allocation (or character) of amounts paid under a contract" or, stated otherwise, in cases "not concerned with ownership of the property interest but with the true reasons for and behind its receipt by the owner." [Citations *428 omitted.] This rule has been invoked to admit extrinsic evidence in cases decided since Estate of Craft. See e.g., Smith v. Commissioner,82 T.C. 705, 716 n. 12 (1984); Ellison v. Commissioner,80 T.C. 378, 393-394 (1983); Weisbart v. Commissioner,79 T.C. 521, 534-535 (1982). We think that a determination of the true consideration petitioner paid for the original Virginia property is more akin to a determination of the allocation or character of payments made under a contract than to a determination of his legal rights or property interests under state law. Thus, under Estate of Craft, we must follow the "third-party to the instrument rule" and admit extrinsic evidence of the amount of consideration petitioner actually paid for the Virginia property. [15] We have admitted the evidence and have found as a fact that petitioner paid $24,900 for the Virginia property. *429 We have also found as a fact that petitioner transferred approximately 44.1 acres [16] of the Virginia property to Dock Dickerson as a finder's fee or broker's commission for locating the property for petitioner. [17] Normally, if a portion of a tract of land is disposed of, the basis of that portion is no longer included in the basis of the remaining tract. In other words, normally the basis of the remaining tract is reduced by the portion of the basis allocable to the transferred property. Cf. Fasken v. Commissioner,71 T.C. 650 (1979). However, the amount of a finder's fee or broker's commission paid in connection with the acquisition of property is included in or added to the basis thereof.E.g., Woodward v. Commissioner,397 U.S. 572, 575 (1970). If a finder's fee or broker's commission is paid out of the property acquired, the purchase price allocable to the transferred property is included in the cost basis of the property retained. Silberberg v. United States,174 F. Supp. 31 (S.D. Cal. 1959). Thus, petitioner's $24,900 basis in the Virginia property was not affected by his payment of a portion of the acreage as a finder's *430 fee or broker's commission to Dickerson. In essence, petitioner actually paid the $24,900 purchase price for 120.4 acres of land. [18]
*431 In 1963 petitioner sold approximately 15 acres of the original Virginia property to the Floyd County School Board. He used the proceeds of the sale ($5,400) plus an additional $1,500 [19] to pay for various capital improvements made to the Virginia property. [20]
The effect of these various transactions on petitioner's basis in the original Virginia property may be summarized as follows: Basis in Virginia property
before school sale and improvements
$24,900.00 Less basis of 15 acres sold to school
(15 acres X $206.81 per acre)
(3,102.15)
Plus cost of improvements
6,900.00 Adjusted basis in Virginia property
$28,697.85 *432 Thus, petitioner had an adjusted basis of $28,697.85 in the Virginia property at the time of the sale to the Turmans in 1978. Because his amount realized was $90,000.00 and respondent conceded that petitioner incurred selling expenses in the amount of $288.00, petitioner realized a gain of $61,014.15 on his 1978 sale of the Virginia property, calculated as follows: Amount realized
$90,000.00
Less: Adjusted basis
$28,697.85
Selling expenses
288.00
28,985.85
Gain realized
$61,014.15
II Gain Recognized - Section 1031
Section 1001(c) provides in general that "the entire amount of the gain * * * on the sale or exchange of property shall be recognized." Section 1031(a) creates an exception to this general rule by providing that no gain shall be recognized if property held for productive use in a trade or business or for investment is exchanged solely for property of a like kind. "Ordinarily, to constitute an exchange, the transaction must be a reciprocal transfer of property, as distinguished from a transfer of property for a money consideration only." Sec. 1.1002-1(d), Income Tax Regs.[21]
*433 Petitioner argues that as evidenced by his clear intent and his admonition to Chappell that he would not purchase the North Carolina property unless he first sold the Virginia property, the sale and subsequent purchase were components of a single integrated plan the substance of which constituted an exchange of the Virginia property for the North Carolina property. Therefore, continues petitioner, he is relieved of recognizing his gain on the sale by section 1031(a). Respondent counters by pointing out that a sale of property for cash and reinvestment of the cash in similar property does not constitute an exchange. Thus, continues respondent, petitioner did not meet the exchange requirement of section 1031(a) and must recognize his gain. We agree with respondent. Petitioner begins by quoting the following passage from Rev. Rul. 57-469, 1957-2 C.B. 521, 522: A fundamental principal [sic] of taxation is that substance and not form governs in tax matters. * * * * * * In determining the substance of a transaction, the situation as it existed in the beginning and at the end of a series of steps and the object sought to be accomplished should be considered. *434 In the instant case, since the sale was only a necessary step in reaching the ultimate desired exchange, the transaction was an exchange within the provisions of section 1031 of the Code. Petitioner also considers the following language from Redwing Carriers, Inc. v. Tomlinson,399 F. 2d 652, 658 (5th Cir. 1968) relevant: Equally well established is the corollary that an integrated transaction may not be separated into its components for the purposes of taxation by either the Internal Revenue Service or the taxpayer. Roebling Securities Corp. v. United States, 1959, D.C. N.J., 176 F. Supp. 844, 847. In Kanawha Gas & Utilities Co. v. Commissioner of Internal Revenue, 5 Cir. 1954, 214 F. 2d 685, 691, our Court through Judge Rives said: In determining the incidence of taxation, we must look through form and search out the substance of a transaction. * * * [cases cited] This basic concept of tax law is particularly pertinent to cases involving a series of transactions designed and executed as parts of a unitary plan to achieve an intended result. Such plans will be viewed as a whole regardless of whether the effect of so doing *435 is imposition of or relief from taxation. The series of closely related steps in such a plan are merely the means by which to carry out the plan and will not be separated. From these statements petitioner distills support for his contention that looking at his sale of the Virginia property and purchase of the North Carolina property in the aggregate, we must conclude that they were not a sale and a purchase, but merely components of a single integrated plan that constituted an exchange even though the conduit for accomplishing the exchange was the receipt and disbursement of cash. Petitioner attempts to bolster his analysis by arguing that the sales contract [with the Turmans] and the offer to purchase and contract [with the Ferebees] were interdependent because petitioner conditioned his offer to purchase the North Carolina property on the sale of the Virginia property. We agree with petitioner that ordinarily the substance and not the form of a transaction should govern the tax consequences thereof. Commissioner v. Court Holding Co.,324 U.S. 331 (1945); Biggs v. Commissioner,69 T.C. 905, 914 (1978), affd. 632 F. 2d 1171 (5th Cir. 1980). *436 However, the touchstone of section 1031 is the requirement that there be an exchange of like-kind properties rather than a cash sale of property followed by a reinvestment of the proceeds in other property. Barker v. Commissioner,74 T.C. 555, 560-561 (1980). As we stated in Barker,74 T.C. at 561: The "exchange" requirement poses an analytical problem because it runs headlong into the familiar tax law maxim that the substance of a transaction controls over form. In a sense, the substance of a transaction in which the taxpayer sells property and immediately reinvests the proceeds in like-kind property is not much different from the substance of a transaction in which two parcels are exchanged without cash. Bell Lines, Inc. v. United States,480 F. 2d 710, 711 (4th Cir. 1973). Yet, if the exchange requirement is to have any significance at all, the perhaps formalistic difference between the two types of transactions must, at least on occasion, engender different results. Accord, Starker v. United States,602 F. 2d 1341, 1352 (9th Cir. 1979). See also Swaim v. United States,651 F. 2d 1066, 1070 (5th Cir. 1981), *437 quoting and applying our language. In short, the conceptual distinction between a section 1031 exchange and a sale and reinvestment is largely one of form. Barker v. Commissioner,supra,74 T.C. at 566. Other courts have also acknowledged that transactions that take the form of a sale and reinvestment cannot, in substance, constitute an exchange for purposes of section 1031. Bell Lines, Inc. v. United States,480 F. 2d 710, 713 (4th Cir. 1973); Carlton v. United States,385 F. 2d 238, 241 (5th Cir. 1967) and cases cited therein; Coastal Terminals, Inc. v. United States,320 F. 2d 333 (4th Cir. 1963). There simply was no exchange of properties in this case. Petitioner dealt only with the Turmans in selling his Virginia property to them for cash; he dealt only with the Ferebees (or their agent) in purchasing their North Carolina property for cash. The Turmans and the Ferebees apparently never met or had any dealings together at all. Petitioner received cash from the Turmans for his Virginia property. This precludes the application of section 1031(a) which requires that the property be "exchanged solely *438 for property of a like kind." As the Court of Appeals for the Fifth Circuit stated in Carlton v. United States,supra,385 F. 2d at 242: The very essence of an exchange is the transfer of property between owners, while the mark of a sale is the receipt of cash for the property. * * * Where, as here, there is an immediate repurchase of other property with the proceeds of the sale, that distinction between a sale and exchange is crucial. * * * [Citations omitted.] Petitioner's arguments concerning the interdependency of the sales contract and the offer to purchase and contract are inapposite. Here, in substance and in form, there was a sale of petitioner's Virginia property for cash and a separate and unrelated purchase of the North Carolina property for cash. There was no interdependency between petitioner's sale contract with the Turmans and his later offer to purchase and contract with the Ferebees. The only relationship between the two transactions was the fact that if petitioner did not sell his Virginia land, he was not going to have the money to buy the North Carolina land. That does not suffice to convert a sale and reinvestment of the proceeds *439 into an exchange of like-kind properties. Petitioner may very well have thought that his transactions amounted to his exchange of his timberland in Virginia for other timberland in North Carolina. However, petitioner's subjective intention or desire that his real estate transactions qualify for nonrecognition treatment does not alter our conclusion. Tax consequences must be determined by what actually takes place and not by what was intended or hoped for. See Weiss v. Stearn,265 U.S. 242, 254 (1924); Rogers v. Commissioner,44 T.C. 126, 136 (1965), affd. per curiam 377 F. 2d 534 (9th Cir. 1967). The fact that two attorneys and a real estate agent told petitioner that his transactions would be tax free does not make them so. [22]
In conclusion, petitioner's sale and reinvestment do not constitute an exchange of like-kind properties, and petitioner must recognize all of the gain realized on the sale. While this result may seem harsh to petitioner, it is necessary if the exchange requirement *440 in section 1031(a) is to have any meaning. See Carlton v. United States,supra,385 F. 2d at 243. Deferral or nonrecognition of gain is the exception to the normal rule, and a taxpayer must bring himself within the terms of the exception. The Congress has provided for such nonrecognition of gain on the sale of a taxpayer's principal residence if he sells the old residence and reinvests the proceeds in a new residence within a certain time period. Sec. 1034. However, in the case of business or investment property, such as in involved here, the Congress has imposed a strict exchange requirement for the taxpayer to obtain such nonrecognition. Sec. 1031. III Negligence Addition
Section 6653(a) imposes an addition to tax if any part of an underpayment of tax "is due to negligence or intentional disregard of rules and regulations (but without intent to defraud)." Petitioner bears the burden of proving that he is not liable for the addition. Catalana v. Commissioner,81 T.C. 8, 17 (1983), affd. without published opinion sub nom. Knoll v. Commissioner,735 F. 2d 1370 (9th Cir. 1984); Foster v. Commissioner,80 T.C. 34, 237 (1983); *441 Bixby v. Commissioner,58 T.C. 757, 791-792 (1972). Petitioner argues that his knowledge of tax law is limited. He was told by two attorneys and a real estate agent that his sale and purchase transactions would be "tax-free." Petitioner claims that he did not report his gain from the sale because he relied in good faith on the advice he was given by individuals he considered knowledgeable on the subject. He perceived no real distinction between a trade of properties and a sale of property and reinvestment of the proceeds in other property. Respondent, on the other hand, contends that petitioner's testimony is not credible. He also relies on petitioner's failure to mention the sale on his 1978 return and his failure to report any other income on the return [23] as supporting imposition of the negligence addition. As discussed above, we found petitioner's testimony wholly worthy of belief and have accepted it in making out findings of fact. We have also *442 acknowledged that while the distinction between an exchange and a sale and reinvestment is necessary in the proper application of section 1031(a), it is nonetheless somewhat formalistic and has generated much litigation. Most importantly, the fact that three individuals whose advice petitioner reasonably relied upon assured him that his sale of the Virginia property would be tax-free weighs heavily in his favor. Although there is no affirmative obligation to seek tax advice, Yelencsics v. Commissioner,74 T.C. 1513, 1533 (1980), reasonable reliance on such advice may relieve a taxpayer from the negligence addition. Industrial Valley Bank & Trust Co. v. Commissioner,66 T.C. 272, 283 (1976). So may a good faith misunderstanding of the law. Yelencsics v. Commissioner,supra,74 T.C. at 1533. After reviewing all of the facts and circumstances of this case, we hold that petitioner has met his burden of showing that the underpayment resulting from his failure to report the gain on his sale of the Virginia property was not due to negligence or intentional disregard of rules and regulations. Accordingly, petitioner is not liable *443 for the 6653(a) addition. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. That portion of the deficiency attributable to the section 56 minimum tax is an automatic computation based on 15 percent of the total tax preference items that exceed the greater of $10,000 or one-half of the "regular tax deduction" (as defined in section 56(c)). Since petitioner filed his return as a married person filing separately, it would seem that the figure of $5,000 should be substituted for the $10,000 figure (see sec. 58(a)), but the statutory notice used $10,000 in the minimum tax computation. Since respondent has raised no issue in that regard, the Court will not address the matter. In his reply brief, respondent "surmises" that petitioner has conceded the first and third issues if we hold for respondent on the second issue because petitioner did not address them in his opening brief. A careful reading of petitioner's opening brief reveals that he did in fact discuss the basis question. Moreover, petitioner clearly addressed both the basis and negligence addition issues in his reply brief. Thus, these issues are contested and have not been conceded by petitioner.↩
3. Petitioner filed his 1978 return on July 15, 1979, prior to the expiration of an extension of time for filing the return granted by respondent. See sec. 6081(a). The Court has accepted the parties' stipulation as to the date of filing of the return, but the face of the Form 1040 bears a stamp indicating receipt by the Internal Revenue Service on June 22, 1979.↩
4. Petitioner and his wife were divorced sometime after the filing of the 1978 return. Petitioner testified and on brief requested that we find as a fact that despite the clear terms of the deed his wife had no ownership interest in the original Virginia property and that he was the sole owner thereof. We note that his wife's name was also on the land contract of September 7, 1978 whereby the Virginia property was sold to John Michael and Wanda A. Turman (the Turmans). Because this question is immaterial to the issues before the Court and contrary to the deed and land contract, we decline to find such a fact. It is undisputed that petitioner alone received the proceeds from the sale of the Virginia property to the Turmans and that he alone purchased the North Carolina property. There has been no suggestion that the wife is liable for any part of the tax deficiency in this case. Her ownership rights in the Virginia property, if any, is a matter between petitioner and his ex-wife, and is not before this Court.↩
5. In his opening statement, petitioner's counsel suggested that the parcel transferred to Dickerson consisted of between 25 and 30 acres. However, no evidence to this effect was submitted. We determined the stated figure by subtracting from the 164.5 acres indicated in the original deed the acreage involved in subsequent transactios described below, as to which sufficient evidence was provided. See n. 8, infra.↩
6. This price represents three acres at $600 per acre ($1,800) plus 12 acres at $300 per acre ($3,600).↩
7. The offer to purchase and contract indicates that petitioner's offer was made on October 26, 1978. However, petitioner testified that he actually signed the document before he contracted to sell the Virginia property, which he did on September 7, 1978. Petitioner's testimony is supported by Chappell's affidavit (which the parties stipulated to) and his own further testimony that petitioner's offer was conditioned upon his first selling the Virginia property. Such a contingency would have been unnecessary if petitioner had actually made his offer on October 26, 1978, because petitioner had already closed the sale of the Virginia property on October 10, 1978. Furthermore, the offer to purchase and contract indicates that the Ferebees accepted petitioner's offer on October 26, 1978. We think it highly unlikely that petitioner's offer was accepted the same day it was made, given the overwhelming evidence that after his initial phone call to the Ferebees petitioner dealt only with Chappell and never directly with the Ferebees. Thus, we conclude that the date of petitioner's offer was inserted into the offer to purchase and contract not when petitioner actually signed the document, but only after it had been accepted by the Ferebees. Consequently, we accept petitioner's testimony and find that he made the offer before contracting to sell the Virginia property. Our finding is not at variance with the parties' stipulation that "[o]n October 26, 1978, the petitioner contracted to buy * * * [the North Carolina property]." Regardless of when it was made, petitioner's offer was not accepted until October 26, 1978. Thus, there was no contract until that date.↩
8. The sales contract called for the sale of approximately 103 acres. However, a U.S. Department of Housing and Urban Development Settlement Statement for the sale indicates that the Virginia property consisted of approximately 105.4 acres at the time of sale. We have used the latter figure to determine the number of acres petitioner transferred to Dickerson. See n. 5, supra.↩
9. The sales contract suggests that petitioner was to retain four acres of the Virginia property. However, respondent calculated the deficiency in the statutory notice and both parties have proceeded throughout this case as if petitioner sold the entire Virginia property. The record is devoid of any other evidence to the contrary. Therefore, we find as a fact that petitioner sold the entire Virginia property.↩
10. Some adjustment must have been made in either the amount of the promissory note or the cash payment at the closing. Petitioner had already paid a $5,000 earnest money deposit. If petitioner used the sales proceeds check in the amount of $84,242.63 to make the cash payment which, under the offer to purchase and contract, was only required to be $80,000, then obviously some adjustment had to be made in the $15,000 promissory note. We are not satisfied that petitioner in fact used the entire $84,242.63 check as his cash payment, as he testified, but whether he did or not is not determinative of any issue is this case.↩
11. On brief respondent contends that petitioner's testimony was contradicted by the deed's recital that the consideration given for the original Virginia property was $10,000 cash. The deed does not state that the $10,000 cash was the only↩ consideration, and thus does not contradict petitioner's testimony that he gave other consideration.
12. We note that petitioner testified that the cancelled promissory note had probably been destroyed when his home burned down in 1958. Petitioner also testified that all of the other individuals involved in his purchase of the Virginia property had passed away. ↩
13. This represents a cost basis of $206.81 per acre, i.e. total basis of $24,900 divided by 120.4 acres, the acreage petitioner actually acquired after paying Dock Dickerson a finder's fee of 44.1 acres.↩
14. Virginia Code section 58-54.1 (1974) was not in force during 1953, the year petitioner purchased the original Virginia property, because it was not added to the Virginia Code until 1968. See 1968 Va. Acts c. 778. Virginia Code sections 58-54 and 58-54.1 were both repealed and essentially recodified at Va. Code sections 58.1-801 and 58.1-802↩ (1984) by 1984 Va. Acts c. 675, effective January 1, 1985.
15. Even if we were to follow the parol evidence rule of the Commonwealth of Virginia, petitioner's testimony would be admissible. Virginia courts have, for quite some time, acknowledged the admissibility of parol evidence to show the true consideration for a deed. Swain v. Virginia Bank & Trust Co.151 Va. 655, 144 S.E. 645 (1928). Later cases have added the caveat, that to be admissible, parol evidence of the consideration paid may not contradict the deed in that it alters the conveyance or the legal effect of the deed. E.g., Gough v. Conley,206 Va. 88, 141 S.E. 2d 690 (1965); Davis v. Marr,200 Va. 479, 106 S.E. 2d 722 (1959); Adams v. Seymour,191 Va. 372, 61 S.E. 2d 23 (1950); Collins v. Lyon, Inc.,181 Va. 230, 24 S.E. 2d 572 (1943); Otey v. Oakey,157 Va. 314, 160 S.E. 8↩ (1931). Petitioner's testimony does not in any way affect the conveyance or the legal effect of the deed. Thus, even under the Virginia parol evidence rule petitioner's testimony is admissible.
16. See n. 5, supra.↩
17. As noted above, respondent also argues that petitioner's failure to introduce documentary evidence of the conveyance is evidence that no conveyance took place. We again reject respondent's argument primarily because of our acceptance of petitioner's testimony. His testimony is also consistent with the legal description of the Virginia property in the sales contract with the Turmans. The description indicates that the Virginia property was bordered on the west by land owned by Dickerson. ↩
18. See n. 13, supra. This situation, in a sense, represents the converse of the severance damages cases. Where a portion of an owner's land is taken by eminent domain and the land owner is paid an amount for the land actually condemned plus an amount for severance damages to the remaining property he retains, the amount he receives as severance damages simply reduces his basis in the retained land. See Vaira v. Commissioner,444 F. 2d 770, 774, n. 6 (3d Cir. 1971), revg. and remanding in part 52 T.C. 986 (1969); Pioneer Real Estate Co. v. Commissioner,47 B.T.A. 886, 892↩ (1942), modified on another point by a Supplemental Memorandum Opinion of the Court. Here petitioner transferred 44.1 acres to Dickerson as a finder's fee so he actually paid the $24,900 to obtain the remaining 120.4 acres.
19. Petitioner testified that this additional amount was between $1,500 and $2,000. Because petitioner's inexactitude is of his own making, we found as a fact that such amount was $1,500. See Cohan v. Commissioner,39 F. 2d 540↩ (2d Cir. 1930). 20. Respondent again urges us not to rely on petitioner's testimony. However, petitioner's testimony was entirely uncontradicted as well as reasonably specific with respect to the types of capital improvements made and the costs thereof. Moreover, the legal description of the Virginia property in the 1978 sales contract with the Turmans indicates that it borders Floyd County High School and that it contains some of the improvements that petitioner testified were those he had made in 1963.↩
21. Section 1.1002-1, Income Tax Regs., was promulgated under section 1002, which has been repealed; at the same time section 1002 was repealed, substantially identical language was added to section 1001(c). See secs. 1901(b)(28)(B)(i) and 1901(a)(121) of the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520, 1799, 1784, 1976-3 (Vol. 1) C.B. 1, 275, 260, effective for taxable years beginning after December 31, 1976. In T.D. 7665, 1980-1 C.B. 319, respondent removed various regulations including section 1.1002, Income Tax Regs. The Treasury Decision was effective January 25, 1980, and intended no substantive changes in the regulations. Although respondent has not placed the substantive provisions of section 1.1002-1, Income Tax Regs., in a regulation under section 1001(c), he has taken the position that it is applicable to section 1001(c). See Rev. Rul. 81-63, 1981-1 C.B. 455, 456. Section 1.1002-1, Income Tax Regs., is therefore applicable to the 1978 taxable year before the Court. See Magneson v. Commissioner,81 T.C. 767, 769-770, n. 2 (1983), affd. 753 F. 2d 1490↩ (9th Cir. 1985).
22. See D'Onofrio v. Commissioner,T.C. Memo. 1983-632 and Meadows v. Commissioner,T.C. Memo. 1981-417↩.
23. We note that the deficiency herein is based solely on the transactions described, and that respondent has not sought to increase the amount thereof based on petitioner's failure to report other income.↩